[Cite as *Anderson v. Westlake*, 2021-Ohio-4582.]

| | | |
|---|---|---|
| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF LORAIN | ) | |

BETHANY ANDERSON, et al.

    Appellants

    v.

CITY OF WESTLAKE, et al.

    Appellees

C.A. No.     19CA011512

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF LORAIN, OHIO
CASE No.    18CV194655

DECISION AND JOURNAL ENTRY

Dated: December 29, 2021

TEODOSIO, Judge.

{¶1} Bethany Anderson, Jon Masterson, Daniel Bush, Kelly Deutschendorf, John Comer, Edmund Leece, and William Winter (collectively "Plaintiffs-Appellants") appeal from the order of the Lorain County Court of Common Pleas granting summary judgment in favor of the City of Avon, Avon law-enforcement officers Andy Kehl, Pat Neuhoff, and Robert Olds, the City of Westlake, and Westlake law-enforcement officers Mark Arcuri, Nathan Fox, and William Eschenfelder (collectively "Defendants-Appellees"). This Court affirms.

I.

{¶2} A white pickup truck was stolen one night from the Sweetbriar Golf Club in Avon Lake. Police were immediately notified, and nearby Avon Officer Neuhoff soon spotted the stolen vehicle on Jaycox Road in Avon. He attempted to initiate a traffic stop by activating his lights and siren, but the suspect refused to stop. What followed was at times a high-speed pursuit through the streets of Avon and into Westlake. Avon Police soon detained a second suspect in

the theft after a traffic stop of a second vehicle. Avon Officer Kehl joined Officer Neuhoff's pursuit of the stolen truck almost immediately and at one point became the primary car in the pursuit following a brief off-road incident at the intersection of Jaycox and Detroit Roads. The suspect continued to flee from police in the stolen truck eastbound on Detroit Road toward Westlake while Avon officers gave chase.

{¶3}   Westlake Officers Arcuri and Fox learned of the pursuit while at their police station and responded, arriving within minutes to the area of Detroit Road near the Dover Gardens Tavern ("the Tavern"), some distance ahead of the pursuit. Officer Arcuri positioned his cruiser in the middle turning lane and deployed his stop sticks in the eastbound lane as the pursuit approached. Officer Fox positioned his vehicle a little further east in the eastbound lane. The suspect drove over the stop sticks, began to fishtail, lost control of the vehicle, and crashed directly into the Tavern, seriously injuring many people within the establishment, including the seven Plaintiffs-Appellants. Overall, the pursuit lasted approximately five minutes, covered approximately five miles, and reached speeds between fifty and eighty miles per hour.

{¶4}   Plaintiffs-Appellants filed a complaint against the Defendants-Appellees alleging willful and/or reckless conduct by the officers within the scope of their employment with the cities of Avon and Westlake, which resulted in Plaintiffs-Appellants' injuries. Defendants-Appellees filed two separate motions for summary judgment on the basis of political subdivision immunity, pursuant to R.C. 2744.02(A), which the trial court ultimately granted.

{¶5}   Plaintiffs-Appellants now appeal from the trial court's judgment granting summary judgment and raise two assignments of error for this Court's review. We have consolidated the assignments of error, as they require the same legal analysis.

II.

**ASSIGNMENT OF ERROR ONE**

THE TRIAL COURT ERRED BY GRANTING THE AVON APPELLEES' MOTION FOR SUMMARY JUDGEMENT (SIC) BECAUSE QUESTIONS OF MATERIAL FACT PRECLUDE A FINDING OF IMMUNITY AS A MATTER OF LAW.

**ASSIGNMENT OF ERROR TWO**

THE TRIAL COURT ERRED IN GRANTING THE WESTLAKE APPELLEES' MOTION FOR SUMMARY JUDGEMENT (SIC) BECAUSE QUESTIONS OF MATERIAL FACT PRECLUDE A FINDING OF IMMUNITY AS A MATTER OF LAW.

{¶6} In their assignments of error, Plaintiffs-Appellants argue that the trial court erred in granting summary judgment on the basis of political subdivision immunity in favor of the cities of Avon and Westlake and the six individual law-enforcement officers. We disagree.

Summary Judgment

{¶7} Appellate review of an award of summary judgment is de novo. *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105 (1996). Summary judgment is appropriate under Civ.R. 56 when: (1) no genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) viewing the evidence most strongly in favor of the nonmoving party, reasonable minds can come to but one conclusion and that conclusion is adverse to the nonmoving party. *Temple v. Wean United, Inc.*, 50 Ohio St.2d 317, 327 (1977), citing Civ.R. 56(C). A court must view the facts in the light most favorable to the nonmoving party and must resolve any doubt in favor of the nonmoving party. *Murphy v. Reynoldsburg*, 65 Ohio St.3d 356, 358-359 (1992). A trial court does not have the liberty to choose among reasonable inferences in the context of summary judgment, and all competing inferences and

questions of credibility must be resolved in the nonmoving party's favor. *Perez v. Scripps-Howard Broadcasting Co.*, 35 Ohio St.3d 215, 218 (1988).

{¶8} The Supreme Court of Ohio has set forth the nature of this burden-shifting paradigm:

[A] party seeking summary judgment, on the ground that the nonmoving party cannot prove its case, bears the initial burden of informing the trial court of the basis for the motion, and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact on the essential element(s) of the nonmoving party's claims. The moving party cannot discharge its initial burden under Civ.R. 56 simply by making a conclusory assertion that the nonmoving party has no evidence to prove its case. Rather, the moving party must be able to specifically point to some evidence of the type listed in Civ.R. 56(C) which affirmatively demonstrates that the nonmoving party has no evidence to support the nonmoving party's claims. If the moving party fails to satisfy its initial burden, the motion for summary judgment must be denied. However, if the moving party has satisfied its initial burden, the nonmoving party then has a reciprocal burden outlined in Civ.R. 56(E) to set forth specific facts showing that there is a genuine issue for trial and, if the nonmovant does not so respond, summary judgment, if appropriate, shall be entered against the nonmoving party.

*Dresher v. Burt*, 75 Ohio St.3d 280, 293 (1996).

<u>Political Subdivision Immunity</u>

{¶9} Ohio's Political Subdivision Tort Liability Act, which governs political subdivision liability and immunity, is codified in R.C. 2744.01 et seq. *McNamara v. City of Rittman*, 125 Ohio App.3d 33, 43 (9th Dist.1998). The general rule is that political subdivisions are immune from tort liability. *Shalkhauser v. Medina*, 148 Ohio App.3d 41, 46 (9th Dist.2002). "In order to determine whether a political subdivision is immune from liability, we engage in a three-tiered analysis." *Moss v. Lorain Cty. Bd. of Mental Retardation*, 9th Dist. Lorain No. 13CA010335, 2014-Ohio-969, ¶ 10, citing *Cater v. Cleveland*, 83 Ohio St.3d 24, 28 (1998).

{¶10} The first tier involves the general grant of immunity to political subdivisions by R.C. 2744.02(A)(1), which provides that "'a political subdivision is not liable in damages in a civil action for injury, death, or loss to person or property allegedly caused by any act or

omission of the political subdivision or an employee of the political subdivision in connection with a governmental or proprietary function.'" *McConnell v. Dudley*, 158 Ohio St.3d 388, 2019-Ohio-4740, ¶ 21, quoting R.C. 2744.02(A)(1).

{¶11} Second, "this comprehensive immunity can be abrogated pursuant to any of the five exceptions set forth at R.C. 2744.02(B)." *Shalkhauser* at 46. "As part of this second tier, the court may also have to consider whether any of the specific defenses to liability for negligent operation of a motor vehicle listed in R.C. 2744.02(B)(1)(a) through (c) apply." *McConnell* at ¶ 22. Relevant to this case is R.C. 2744.02(B)(1)(a), which provides immunity for law-enforcement officers operating a motor vehicle and responding to an emergency call from liability for any injuries resulting from the negligent operation of the motor vehicle, so long as "the operation of the vehicle did not constitute willful or wanton misconduct * * *." The terms "willful" and "wanton" describe different and distinct degrees of care and are not interchangeable. *Anderson v. Massillon*, 134 Ohio St.3d 380, 2012-Ohio-5711, paragraph one of the syllabus. "Willful misconduct implies an intentional deviation from a clear duty or from a definite rule of conduct, a deliberate purpose not to discharge some duty necessary to safety, or purposefully doing wrongful acts with knowledge or appreciation of the likelihood of resulting injury." *Id.* at paragraph two of the syllabus. "Wanton misconduct is the failure to exercise any care toward those to whom a duty of care is owed in circumstances in which there is great probability that harm will result." *Id.* at paragraph three of the syllabus.

{¶12} If any one of the five exceptions to immunity in R.C. 2744.02(B) applies and if any defenses that may be asserted by the political subdivision under R.C. 2744.02(B)(1) do not apply, then the court's analysis proceeds to the third tier. *McConnell* at ¶ 23. In the third tier of

the analysis, "immunity may be restored, and the political subdivision will not be liable, if one of the defenses enumerated in R.C. 2744.03(A) applies." *Moss* at ¶ 10.

{¶13} For the individual employees of political subdivisions, the three-tiered immunity analysis does not apply. *Rankin v. Cuyahoga Cty. Dept. of Children and Family Servs.*, 118 Ohio St.3d 392, 2008-Ohio-2567, ¶ 36. We instead look directly to R.C. 2744.03(A)(6), which prescribes defenses or immunities that an employee of a political subdivision may assert to establish nonliability in a civil action for damages allegedly caused by an act or omission in connection with a governmental or proprietary function. *Argabrite v. Neer*, 149 Ohio St.3d 349, 2016-Ohio-8374, ¶ 7. Relevant to this case is R.C. 2744.03(A)(6)(b), which states that an employee is immune from liability unless his "acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner * * *." "This standard applies to law-enforcement officers just as it applies to other employees of political subdivisions." *Argabrite* at ¶ 7. "One acts with a malicious purpose if one willfully and intentionally acts with a purpose to cause harm." *Moss v. Lorain Cty. Bd. of Mental Retardation*, 185 Ohio App.3d 395, 2009-Ohio-6931 (9th Dist.), ¶ 19. "The term 'bad faith' embraces more than bad judgment or negligence; it is conduct that involves a dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive or ill will partaking of the nature of fraud." *Thomas v. Bauschlinger*, 9th Dist. Summit No. 26485, 2013-Ohio-1164, ¶ 22. Once more, "[w]anton misconduct is the failure to exercise any care toward those whom a duty of care is owed in circumstances in which there is great probability that harm will result." *Anderson* at paragraph three of the syllabus. Finally, "[r]eckless conduct is characterized by the conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct." *Id.* at paragraph four of the

syllabus. To be reckless, the actor must be conscious that his conduct will in all probability result in injury, i.e., there must be a perverse disregard of a known risk. *Chunyo v. Gauntner*, 9th Dist. Summit No. 28346, 2017-Ohio-5555, ¶ 9; *O'Toole v. Denihan*, 118 Ohio St.3d 374, 2008-Ohio-2574, paragraph three of the syllabus. "[A]n officer's mere negligence in the performance of official duties does not give rise to personal liability." *Hoffman v. Gallia Cty. Sheriff's Office*, 4th Dist. Gallia No. 17CA2, 2017-Ohio-9192, ¶ 37, citing *Fabrey v. McDonald Village Police Dept.*, 70 Ohio St.3d 351, 357 (1994).

{¶14} The Supreme Court of Ohio has stated that "[t]hese are rigorous standards that will in most circumstances be difficult to establish, especially with respect to a law-enforcement officer carrying out the statutory duty to arrest and detain a person violating the law." *Argabrite* at ¶ 8, citing R.C. 2935.03(A)(1). Indeed, no other public employee faces the potential danger, violence, or unique statutory responsibilities a law-enforcement officer faces. *Id.* at ¶ 15. We expect law-enforcement officers to protect the public, but that expectation need not obligate those officers to sit idly by while a suspect flees the scene of a crime, particularly when the suspect's flight itself endangers the general public further. *Id.* at ¶ 16. The officers need not take such a chance and hope for the best, especially when there exists no way to convey convincingly to the fleeing suspect that his pursuit has been terminated and he is free to go, and he may conceivably be just as likely to continue driving recklessly given the uncertainty surrounding his fate. *Scott v. Harris*, 550 U.S. 372, 385 (2007).

> [W]e are loath to lay down a rule requiring the police to allow fleeing suspects to get away whenever they drive *so recklessly* that they put other people's lives in danger. It is obvious the perverse incentives such a rule would create: Every fleeing motorist would know that escape is within his grasp, if only he accelerates to 90 miles per hour, crosses the double-yellow line a few times, and runs a few red lights.

(Emphasis sic.) *Id. See also Agrabrite* at ¶ 62 (Kennedy, J., concurring in judgment only).

{¶15} Accordingly, the danger of a high-speed chase alone is not enough to present a genuine issue of material fact as to whether an officer has acted with a malicious purpose, in bad faith, or in a wanton or reckless manner. *Argabrite* at ¶ 16, citing *Shalkhauser* at 50-51. Some courts have instead identified many factors that may be relevant when determining if a law enforcement officer operated a motor vehicle willfully, wantonly, recklessly, or simply negligently, including but not limited to:

> (1) the officer's speed; (2) whether the officer was traveling in the correct lane of travel; (3) whether the officer had the right-of-way; (4) the time of day; (5) the weather; (6) the officer's familiarity with the road; (7) the road contour and terrain; (8) whether traffic was light or heavy; (9) whether the officer made invasive maneuvers (i.e., attempting to force the vehicle from the road) or evasive maneuvers (i.e., attempting to avoid a collision); (10) the nature and seriousness of the offense that prompted the emergency; (11) whether the officer possessed a safer alternative; (12) whether the officer admitted to disregarding the consequences of his actions; (13) whether the officer activated the vehicle's lights and siren[]; and (14) whether the officer violated any applicable departmental policy.

*Hoffman* at ¶ 49. No one factor is determinative though, and courts must instead consider the totality of the circumstances surrounding the pursuit. *Id.*

{¶16} As an initial matter, we note that it is undisputed here that the cities of Avon and Westlake are political subdivisions of the state of Ohio, and that the Avon and Westlake law-enforcement officers involved are employees of those cities. *See* R.C. 2744.01(F) (defining "political subdivision"); R.C. 2744.01(B) (defining "employee"). Moreover, "[t]he provision or nonprovision of police * * * services or protection" is a "governmental function." *See* R.C. 2744.01(2)(a).

Individual Law-Enforcement Officers

{¶17} In the weeks preceding October 23, 2014, Avon Officers Pat Neuhoff and Andy Kehl were made aware of a rash of recent home burglaries in Avon Lake, which also involved

stolen vehicles. While on duty on October 23, 2014, at approximately 8:50 P.M., the officers heard over the police radio that a white pickup truck was just stolen from the Sweetbriar Golf Club in Avon Lake, just north of Officer Neuhoff's location. Officer Neuhoff proceeded northbound on Jaycox Road and soon spotted the stolen vehicle traveling southbound on Jaycox. He activated his lights and siren and made a U-turn to initiate a traffic stop of the vehicle, but the suspect refused to pull over and stop his vehicle. Officer Kehl joined the pursuit right as it began and fell in behind Officer Neuhoff as the secondary vehicle, heading southbound on Jaycox.

{¶18} Officer Neuhoff testified at his deposition that the suspect's driving was "erratic" during the pursuit that followed, as he weaved while passing other motorists and crossed over the double-yellow line. Over the next approximately one-mile stretch of Jaycox Road, very few motorists are visible in Officer Neuhoff's dash cam video, all of whom are already stopped on the side of the road or are slowing down to stop when the pursuit passes them. Notably, before the suspect reaches the first of these vehicles, he activates the emergency hazard lights on the stolen truck.

{¶19} When the suspect reached the intersection of Jaycox and Detroit Roads, he ran the red light and almost crashed into another vehicle crossing the intersection, although he slowed down somewhat before doing so. In his dash cam video, Officer Neuhoff also slows down and hesitates before proceeding cautiously through the intersection himself. The suspect then turned left, drove through some small patches of grass or landscaping of a corner deli parking lot, and soon emerged onto Detroit Road, now heading eastbound. As Officer Neuhoff attempted to follow him through the grass and parking lot, Officer Kehl became better positioned to pursue the suspect, and he immediately took over as the lead vehicle in the pursuit just as the suspect re-entered the roadway. Officer Kehl's dash cam video shows him slowing down at the intersection

of Jaycox and Detroit Roads to allow another vehicle to safely cross in front of him before he turns left onto Detroit. Officer Neuhoff's entire pursuit of the suspect as the lead vehicle down this very straight stretch of Jaycox Road only lasted a total of one minute. His dash cam video shows him following the suspect at a reasonable distance the entire way. At times, he crossed over the double-yellow line in order to pass a few motorists who were either slowly pulling over to the side of the road or had already pulled over and stopped.

{¶20} Officer Kehl also appears to maintain a reasonable distance behind the suspect at all times throughout the pursuit. He testified at his deposition that the pursuit in this case took place on dry road conditions and reached speeds between fifty and eighty miles per hour while on Detroit Road, but noted that the officers had to drive faster than the suspect at times to catch up to him. While he agreed it was fair to describe some of the areas as highly-populated, and both commercial and residential, he characterized the traffic as light and testified that he personally observed no pedestrians. In the dash cam video, the pursuit passes less than ten stopped vehicles on the short stretch of Detroit Road between Jaycox Road and Nagel Road, and they are already stopped on the side of the road. The suspect runs a red light at the Nagel Road intersection, and the dash cam video shows Officer Kehl slowing his cruiser down before cautiously proceeding through the intersection. Someone, although it is unclear who, can also be heard sounding a car horn repeatedly as the pursuit approaches that intersection. During the next, much longer stretch of road between Nagel Road and Crocker Road, over twenty-some vehicles are present and are almost all stopped on the side of the road. After that intersection and until the end of the pursuit, fewer vehicles are present and they are pulled over and stopped on the side of the road. Thus, while the dash cam videos show times when very few or no other vehicles are present, the volume of traffic indeed fluctuates and traffic sometimes becomes more

congested, mainly near select intersections. At one point, the suspect also struck some orange construction barrels and cones in a construction zone on Detroit Road.

{¶21} Sergeant Robert Olds was the senior Avon officer in charge that evening who supervised the pursuit. He cleared a traffic stop unassociated with this matter and then monitored the radio traffic while proceeding toward the pursuit. He testified that "[t]he goal of [a] pursuit is to stop the person from hurting or harming anyone else or themselves. It's to bring them safely to a stop and get them apprehended." He explained his reasoning behind not ordering his officers to terminate this particular pursuit as follows:

> Obviously the speeds on the two-lane road were high, but traffic was light. Weather was good. The suspect had turned off his lights, and now we have an obligation, really, to make sure that somebody else doesn't get hit, an oncoming car. Now we're kind of like the only thing people are seeing because the suspect has his lights off. It's our responsibility to get that person stopped as best we can.

Although he acknowledged that a suspected accomplice was apprehended during the pursuit, Sergeant Olds testified that he did not recall officers garnering any information about the suspect in the truck from the accomplice because the situation was "very quick" and "ever-evolving."

{¶22} Officer Kehl testified that the goals of the pursuit were to make sure the public was protected, to make sure nobody was being harmed, and to stop the suspect's vehicle. He testified that he was determined to protect the public and felt the pursuit itself did not pose a danger to the community. He testified that the suspect's actions during the pursuit, while admittedly erratic and reckless, were not immediately dangerous, and he observed nothing outrageous which would have caused the officers to discontinue the pursuit. He testified that it is safer to continue pursuing this type of driver rather than discontinuing the pursuit "[i]f it's going to stop them from continuing on and causing any more damage * * *." He further testified that allowing the suspect to continue driving that way was a public safety hazard. He testified that

the officers were hoping their pursuit would cause the suspect to stop. Because the suspect turned off his headlights on Detroit Road, which posed a risk to oncoming traffic, he testified that the officers' lights and sirens served as a warning to the public to pull off to the side of the road. Officer Kehl agreed there are some schools on Detroit Road, but he testified that no school zones were activated, as school was not in session at that time of night. He admitted to learning that a second suspect was in custody sometime while he was on Detroit Road. Officer Neuhoff also admitted to learning the same at some point early on in the pursuit.

{¶23} Officer Neuhoff testified that the most important factor to him during a pursuit is the safety of the members of the community. According to him, he is "consistently thinking what's going to happen" and "at no time during [this] pursuit did [he] feel it was unsafe * * *." He testified that the risk of somebody getting injured was not high in this particular pursuit. According to him, the risk was instead very low, as he felt traffic was light, very few cars were on the road, and "nobody" was out. While he agreed that the suspect turned his headlights off at one point and that the pursuit reached speeds of approximately eighty miles per hour at times while officers attempted to catch up to him, he testified that the suspect's speed was not so excessive that a crash was likely and noted that the suspect was maintaining control of the vehicle.

{¶24} Westlake Officers Mark Arcuri and Nathan Fox were working in the records room at their police station that evening when dispatch informed them of the stolen truck pursuit proceeding eastbound from Avon toward Westlake. They immediately responded and drove toward the pursuit, eventually arriving near the Tavern on Detroit Road in less than three minutes. Dispatch informed the officers that the pursuit had reached speeds of up to seventy-five miles per hour. Officer Arcuri testified that the location at which he stopped his cruiser and

deployed his stop sticks "basically chose itself." He parked his cruiser in the middle turning lane on Detroit Road, approximately five hundred feet from the Tavern, facing westbound, with his headlights on and his overhead emergency lights off. This particular stretch of road has a slight curve or bend in it and consists of three lanes: an eastbound lane, a westbound lane, and a middle turning lane. Officer Arcuri agreed that the area where he parked his cruiser is a heavily-populated area, but he maintained that he "wouldn't say there were a lot of people around that time of night."

{¶25} Officer Arcuri testified that he deployed his stop sticks and notified dispatch in an effort to terminate the pursuit and to stop it from reaching the next intersection "where it might cause an accident." It appears from Officer Kehl's dash cam video that the suspect crossed over Officer Arcuri's stop sticks just prior to dispatch informing Avon officers that stop sticks had been deployed. According to Lieutenant William Eschenfelder—who was the Westlake officer in charge, the head of the Accident Investigation Unit, and the accident reconstructionist for this particular incident—both of the stolen truck's passenger side tires and likely one of the driver side tires struck the stop sticks. The stop sticks failed to work properly, however, and they never actually punctured or deflated any of the truck's tires. Nevertheless, the suspect's vehicle began to swerve and fishtail before leaving the roadway, sliding sideways, and ultimately crashing into the Tavern. In his investigation, Lieutenant Eschenfelder calculated the truck's average speed to be between seventy-four and seventy-nine miles per hour at the time the suspect lost control of the vehicle. At the time of the crash, Officer Fox's cruiser was parked and facing southeast in the eastbound lane, east of Officer Arcuri and across from the Tavern. Officer Fox testified that he parked this way in an effort to not blind oncoming traffic with his headlights. He intended to deploy his stop sticks as well, but he was unsuccessful in doing so due to time constraints. Once

the suspect finally crashed into the Tavern, officers from both Avon and Westlake converged on the Tavern to detain the suspect and help those injured. Lieutenant Eschenfelder made sure multiple "squads" were en route to the scene and further ensured his two dispatchers were making all the necessary calls.

{¶26} Lieutenant Eschenfelder testified that the "[s]afety of the public is always a primary concern." Officer Arcuri also testified that the safety of the community is his top priority when deploying stop sticks. He testified that he did not believe anyone in the Tavern was in harm's way because being inside of a building is "pretty safe." He expected "[the truck's] tires would deflate and the pursuit would be over[,]" but he admittedly "wasn't surprised that it lost control" and acknowledged "there was a possibility that would happen." Officer Fox testified, however, that he *was* surprised the truck lost control and crashed into the Tavern because "[m]ost vehicles don't do that." Lieutenant Eschenfelder testified that striking Officer Arcuri's stop sticks, which failed to work properly, "would have little or no bearing on [the suspect's] ability to control the [truck]."

{¶27} The Supreme Court of Ohio has stated that when a complaint fails to allege malice, bad faith, or wanton or reckless conduct, an appellate court strays well beyond the pleadings and errs if it reverses the judgment of the trial court in that regard. *Elston v. Howland Local Schools*, 113 Ohio St.3d 314, 2007-Ohio-2070, ¶ 31-32. Following *Elston*, many appellate courts have concluded that allegations of malice, bad faith, or wanton or reckless conduct must be included in a plaintiff's complaint against a political subdivision for those issues to be considered on summary judgment. *Folmer v. Meigs Cty. Commrs.*, 4th Dist. Meigs No. 16CA17, 2018-Ohio-31, ¶ 34 (listing cases). Here, Plaintiffs-Appellants failed to plead in their complaint that the individual officers acted with malicious purpose, in bad faith, or in a wanton manner.

The complaint repeatedly and specifically describes the alleged conduct of the officers only as "reckless" and/or "willful," without any allegations, either direct or indirect, that they acted with a malicious purpose, in bad faith, or in a wanton manner. Plaintiffs-Appellants were therefore barred from raising on summary judgment allegations that the officers acted with malicious purpose, in bad faith, or in a wanton manner. *See id.* at ¶ 35-38 (determining the trial court erred in finding a genuine issue of material fact existed regarding whether a defendant-appellant acted "with malicious purpose, in bad faith, or recklessly[,]" when plaintiff-appellee's complaint only alleged that defendant-appellant acted "negligently, willfully, and wantonly"). Accordingly, for the individual law-enforcement officers in this matter, we are limited to only determining if a genuine issue of material fact exists regarding whether they acted in a reckless manner. *See Elston* at ¶ 31-32; R.C. 2744.03(A)(6)(b); *Elsass v. Crockett*, 9th Dist. Summit No. 22282, 2005-Ohio-2142, ¶ 19 ("[B]ecause appellants only argue that [the officer's] acts were reckless, rather than done with malicious purpose, in bad faith, or in a wanton manner, this Court only analyzes the matter in terms of recklessness.").

{¶28} "This Court recognizes that issues regarding recklessness are generally questions that are presented to a jury." *Cunningham v. Akron*, 9th Dist. Summit No. 22818, 2006-Ohio-519, ¶ 24. Nevertheless, we must also acknowledge that the standard for showing reckless conduct is high. *Id.* Once again, "[r]eckless conduct is characterized by the conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct." *Anderson* at paragraph four of the syllabus. The officers must be conscious that their conduct will in all probability result in injury, i.e., there must be a perverse disregard of a known risk. *Chunyo* at ¶ 9; *O'Toole* at paragraph three of the syllabus. Therefore, summary judgment on the basis of immunity will be

appropriate if the officers' actions show they had no knowledge or reason to know of facts that would lead a reasonable person to believe that their conduct created an unnecessary risk of physical harm. *Elsass* at ¶ 32.

{¶29} Plaintiffs-Appellants argued that the Avon officers acted recklessly in failing to abandon their dangerous high-speed pursuit of the stolen truck. They argued that the nighttime pursuit reached speeds of eighty miles per hour on a major two-lane road and proceeded over the double-yellow line, through heavy traffic, red lights, landscaping, and construction and school zones, in densely-populated commercial and residential areas. Moreover, the fleeing suspect was only sought in connection with the non-violent property crime of stealing the truck, and his co-conspirator was already in custody. According to Plaintiffs-Appellants, the officers should have abandoned the pursuit and relied on "more typical police work" as a safer alternative. They argued that four of the *Hoffman* factors weighed against the Avon officers: (1) the officers' speed; (2) the nature and seriousness of the offense that prompted the emergency; (3) whether the officers possessed a safer alternative; and (4) whether the officers were traveling in the correct lane of travel.

{¶30} When considering the *Hoffman* factors, however, no single factor is determinative, and the totality of the circumstances surrounding the pursuit should be considered. *See Hoffman* at ¶ 49. The Avon officers testified that they felt this pursuit was safe, and they further stressed public safety as the most important factor in vehicle pursuits. Officer Neuhoff testified that he believed a crash was not likely and felt the suspect was maintaining control of the truck. While the pursuit sometimes reached speeds between fifty and eighty miles per hour, there were also times when it proceeded at a much slower pace. Although the pursuit happened at night, the weather was clear and the streets were fairly straight, dry, and well-lit for the most

part. The suspect turned off his headlights, but turned on his emergency hazard lights, while the pursuing officers had their emergency lights and sirens on throughout the pursuit. Traffic volume fluctuated during the pursuit; sometimes few to no vehicles were on the road and sometimes several vehicles were on the road. The circumstances occasionally necessitated the officers driving over the double-yellow line and, at one point early on, briefly through some landscaping in a corner parking lot. The officers crossed the double-yellow line at times to pass vehicles that were either attempting to pull over or had already pulled over, but not during times when oncoming traffic was present in the other lane. *Compare Scott v. Harris*, 550 U.S. 372, 392 (2007) (Stevens, J., dissenting) ("Passing a slower vehicle on a two-lane road always involves some degree of swerving and is not especially dangerous if there are no cars coming from the opposite direction."). Although the underlying allegation was the theft of the truck, which Plaintiffs-Appellants stressed is merely a non-violent property offense, it was still a serious felony offense. The officers were also aware of a rash of recent burglaries in the area involving homes and stolen vehicles. Plaintiffs-Appellants argued that the officers had a safer alternative because they knew the make, model, and license plate number of the stolen truck, as well as the location of the theft; so they should have abandoned the pursuit and relied on "more typical police work" to apprehend the suspect and recover the truck sometime later. The evidence did show that an accomplice was apprehended separately sometime during the pursuit. But, the incident happened quickly and Sergeant Olds did not recall his officers obtaining any information about the suspect from his accomplice. We must also remain cognizant that officers are not required to always allow suspected felons to avoid apprehension simply by fleeing— relying instead on the hope of his capture sometime in the future—especially when the suspect's flight endangers the general public further. *See Argabrite* at ¶ 16; *Scott* at 385. Contrarily, law-

enforcement officers have a duty to apprehend reckless motorists who make the roads dangerous to others. *Shalkhauser* at ¶ 25. There is no evidence in the record that the Avon officers violated any specific departmental policies at any time. Plaintiffs-Appellants did introduce a report from Charles Drago, the consultant hired in the dismissed federal case regarding this matter. The report concludes that, in Mr. Drago's opinion, the Avon officers "failed to follow accepted police practices as well as Avon Police Department policies when they failed to terminate the pursuit." We agree with the trial court that this report does not create any issues of *fact*, however, and merely states Plaintiffs-Appellants' position with respect to Defendants-Appellees' culpability, which is a legal conclusion. *See Shalkhauser* at ¶ 41, citing *Hackathorn v. Preisse*, 104 Ohio App.3d 768, 772 (9th Dist.1995).

{¶31} Next, Plaintiffs-Appellants argued that the Westlake officers acted recklessly by intervening in the pursuit, setting up a roadblock, and using stop sticks, in violation of a multitude of departmental policies. The Supreme Court of Ohio has stated that while a violation of departmental policy may be relevant to determining the culpability of a course of conduct, it does not equate to per se recklessness. *Anderson* at ¶ 37; *Argabrite* at ¶ 21. Evidence of a policy violation demonstrates negligence, at best, unless there is evidence the actor has knowledge that his "'conduct will in all probability result in injury.'" *Argabrite* at ¶ 21, quoting *O'Toole* at paragraph three of the syllabus.

{¶32} Officer Arcuri testified that he and Officer Fox responded to the call to "assist in any way [they] could" because it is their obligation to "go and do something." Westlake's pursuit policy permits officers to become "actively involved" in pursuits initiated by outside agencies "only when circumstances warrant and when assigned to assist by the [officer in charge]." According to Lieutenant Eschenfelder, he never explicitly assigned Officers Arcuri or

Fox to assist in the pursuit; nor was there any evidence that Avon police requested any assistance. Despite the language of Westlake's policy, however, Lieutenant Eschenfelder testified that he believed his officers were authorized to become involved in the pursuit because he did not object to the dispatcher's "all-car call-out[.]" Officer Arcuri also disputed the attempted characterization of his actions in this matter as "active involvement" in the pursuit, claiming instead that active involvement "entails chasing" and "[a]t no time was [he] chasing anyone." Lieutenant Eschenfelder likewise testified that intercepting a pursuit is not the same as participating in a pursuit.

{¶33} For pursuits initiated by outside agencies, Westlake's policy provides that officers "may position themselves strategically in order to assist with traffic control, or to assist in an arrest should the pursuit terminate." The policy also provides that an assisting agency shall "avoid intersecting the path of an oncoming high[-]speed vehicle * * *." Officer Arcuri blocked the middle turning lane with his cruiser, while Officer Fox blocked the eastbound lane, albeit further down the road. The parties dispute whether this amounted to implementing a "roadblock," which is defined in the pursuit policy as "[a]ny method, restriction, or obstruction utilized or intended for the purpose of preventing free passage of motor vehicles on any street or highway in order to effect the apprehension of an actual or suspected violator in a motor vehicle." Although Officer Arcuri also deployed his stop sticks in the eastbound lane, the policy specifically states that the "[u]se of roadspike devices are not considered a roadblock."

{¶34} If a roadblock is implemented, Westlake's policy requires any police cruisers involved to be facing the general direction that the suspect's vehicle is traveling. Officer Arcuri, however, positioned his cruiser directly facing the opposite direction of the fast-approaching pursuit. Officer Fox intentionally angled his cruiser away from the pursuit in order not to blind

the vehicles with his headlights. The policy states that overhead emergency lights should be in operation along with 4-way flashers, but bright lights and spotlights should not be used as they can temporarily blind oncoming vehicles. Officer Arcuri's cruiser, however, did not have its overhead emergency lights or 4-way flashers activated, and instead only had its headlights on, directly facing the incoming pursuit. Finally, the policy states that an open path should be left through the restricted area, designed so that it would be necessary to proceed slowly through it. The westbound lane in this matter remained open, but Officer Arcuri agreed that proceeding through that lane would have required the suspect to travel the wrong way on the road.

{¶35} Officer Arcuri testified that he intended to terminate the pursuit and prevent an accident by deploying his stop sticks. Although he was never instructed or requested to deploy his stop sticks, Lieutenant Eschenfelder testified that that decision is typically made by the individual officers. Westlake's pursuit policy provides that "[t]he communication and deployment of resources such as stop sticks must be coordinated with the initiating agency prior to use." Officer Arcuri agreed that his use of stop sticks was not coordinated with Avon police. The stop stick guidelines followed by Westlake also require "ample warning" to be given to fellow officers in the pursuit. Officer Kehl's dash cam video reveals that the use of stop sticks was not communicated to Avon officers from dispatch until just after the suspect passed over the stop sticks. The Westlake officers indeed testified that they had a limited amount of time to react in this matter, but their guidelines also caution officers to "never rush a deployment [of stop sticks]." Speeds of up to seventy-five miles per hour were communicated to Westlake officers, and Officer Arcuri believed the suspect's truck was accelerating to possibly over eighty miles per hour as it approached him. The stop stick guidelines warn officers to use "extreme caution"

when pursuits reach "excessive speeds" to reduce the risk of serious or fatal injuries resulting from a vehicle crash.

{¶36} High-speed pursuits are inherently dangerous, but this notion alone is not enough to present a genuine issue of material fact as to whether an officer has acted in a reckless manner. *See Argabrite* at ¶ 16. In the case sub judice, even when viewing the evidence most strongly in favor of the Appellants-Plaintiffs, reasonable minds could only conclude that none of the six individual law-enforcement officers' actions rose to a level of recklessness at any time. It is worth noting that Plaintiffs-Appellants agreed in their merit brief that the trial court's assessment that the officers "properly and rationally balanced their duty to protect the public, apprehend felons, and arrest and detain [the suspect] while subjecting the public to as little danger as possible" was "not unreasonable." Nothing in the record before us reveals a conscious disregard of or indifference to a known or obvious risk of harm to another by any of the officers that was unreasonable under the circumstances and was substantially greater than negligent conduct. *See Anderson* at paragraph four of the syllabus. There is no evidence that the officers knew that their actions would in all probability result in injury, i.e., there was no perverse disregard of a known risk. *See Chunyo* at ¶ 9; *O'Toole* at paragraph three of the syllabus. In fact, the evidence shows that the officers not only believed the pursuit was safe, but also exercised a commendable degree of care for public safety throughout the incident. Although Officer Arcuri testified that he was not surprised when the suspect lost control of the truck after hitting the stop sticks, there is no evidence that the officer knew his actions would likely cause any injury. Contrarily, Officer Arcuri testified that he expected to end the pursuit by deflating the suspect's tires and that he believed no one inside of the Tavern building was in harm's way. Even when considering the relevance of the possible departmental policy violations by the Westlake officers in this matter,

the commission of such violations does not equate to per se recklessness. *See Anderson* at ¶ 37; *Argabrite* at ¶ 21. Moreover, even assuming arguendo that one or more of the officers' actions could be considered negligent at times, negligence would not be sufficient to strip them of their statutory immunity. *See Hoffman* at ¶ 37; *Fabrey* at 357.

{¶37} Accordingly, after reviewing the evidence and all reasonable inferences in a light most favorable to the Plaintiffs-Appellants, we conclude that no genuine issue as to any material fact remains to be litigated, and the six law-enforcement officers are all entitled to judgment as a matter of law. Plaintiffs-Appellants did not allege in their complaint that the officers acted with malicious purpose, in bad faith, or in a wanton manner; and because reasonable minds could only conclude that they did not act in a reckless manner, the officers are entitled to immunity and summary judgment. *See* R.C. 2744.03(A)(6)(b); *Argabrite* at ¶ 7.

Cities of Avon and Westlake

{¶38} Turning now to the cities of Avon and Westlake, we must engage in a three-tiered analysis of their immunity. *See Moss v. Lorain Cty. Bd. of Mental Retardation*, 9th Dist. Lorain No. 13CA010335, 2014-Ohio-969, ¶ 10. With respect to the first tier, it is undisputed that the cities of Avon and Westlake are political subdivisions of the state of Ohio, and Avon and Westlake law-enforcement officers are employees of those cities. *See* R.C. 2744.01(F) (defining "political subdivision"); R.C. 2744.01(B) (defining "employee"). Moreover, "[t]he provision or nonprovision of police * * * services or protection" is a "governmental function." *See* R.C. 2744.01(C)(1) and (2)(a). The two cities therefore enjoy immunity from liability for injuries or loss allegedly caused by any act or omission of its law-enforcement officers in connection with providing police services or protection unless one of the R.C. 2744.02(B) exceptions applies.

{¶39} Moving on to the second tier of the analysis, "political subdivisions are liable for injury, death, or loss to person or property caused by the negligent operation of any motor vehicle by their employees when the employees are engaged within the scope of their employment and authority" unless "[a] member of a municipal corporation police department or any other police agency was operating a motor vehicle while responding to an emergency call and the operation of the vehicle did not constitute willful or wanton misconduct * * *." R.C. 2744.02(B)(1)(a). There is no dispute that the officers here were responding to an emergency call in this matter. *See* R.C. 2744.01(A) (defining "emergency call").

{¶40} Plaintiffs-Appellants failed to plead "wanton misconduct" in their complaint for the purpose of overcoming the cities' immunity defense under to R.C. 2744.02(B)(1)(a). *See Pitzer v. City of Blue Ash*, 1st Dist. Hamilton No. C-180033, 2019-Ohio-2889, ¶ 7 (determining that the failure to plead correctly, or to subsequently amend the complaint to reflect the proper standard, bars a plaintiff from later raising those issues on summary judgment). The complaint here only alleged that the officers engaged in "reckless" and/or "willful" conduct. "'Willful,' 'wanton,' and 'reckless' describe different and distinct degrees of care and are not interchangeable." *Anderson* at paragraph one of the syllabus. Plaintiffs-Appellants were therefore barred from raising the issue of wanton misconduct on summary judgment. *See, e.g., Pitzer* at ¶ 7. Accordingly, for the cities of Avon and Westlake, we are limited to only determining if a genuine issue of material fact exists regarding whether the officers' operation of their motor vehicles constituted willful misconduct. *See* R.C. 2744.02(B)(1)(a). "Willful misconduct implies an intentional deviation from a clear duty or from a definite rule of conduct, a deliberate purpose not to discharge some duty necessary to safety, or purposefully doing wrongful acts with knowledge or appreciation of the likelihood of resulting injury." *Anderson* at

paragraph two of the syllabus. The intent implied from the word "willful" in this context relates to the misconduct and not merely to the fact that some specific act, such as operating an automobile, was intentionally done. *Hoffman* at ¶ 43. Willful misconduct, in the automobile context, generally contemplates:

> either the doing of an act with specific intent to injure [another], or, with full knowledge of existing conditions, the intentional execution of a wrongful course of conduct which he knows should not be carried out or the intentional failure to do something which he knows should be done in connection with his operation of the automobile, under circumstances tending to disclose that the motorist knows or should know that an injury to [another] will be the probable result of such conduct.

*Id.*, quoting *Tighe v. Diamond*, 149 Ohio St. 520, 527-28 (1948).

{¶41} There is no evidence indicating that any of the law-enforcement officers engaged in willful misconduct while operating their cruisers. The Avon officers were attempting to stop a suspected felon, and their pursuit of him took place in fair conditions at varying speeds for about five minutes in total. Despite fluctuating degrees of traffic on the roads, no pedestrians can be seen in the dash cam videos. A brief off-road incident occurred, and the suspect later hit a couple of construction barrels and cones, but to borrow a quote from Justice Stevens: "This is hardly the stuff of Hollywood." *Scott v. Harris*, 550 U.S. 372, 392 (2007) (Stevens, J., dissenting). The Avon officers testified that they believed the pursuit was safe. The dash cam videos also show the officers exercising *some* degree of care throughout the pursuit. *See Pendry v. Troy Police Dept.*, 2d Dist. Montgomery No. 28531, 2020-Ohio-3129, ¶ 16 (finding no evidence to support a finding of willful misconduct where uncontroverted evidence demonstrated that the officers exercised *some* care in pursuing a stolen pickup truck). For example, the officers used their lights, sirens, and radio, maintained a reasonable distance behind the suspect,

never attempted to force him off the road, and slowed down at times for the safety of others and to allow other motorists to safely pass in front of them. *See id.*

**{¶42}** Likewise, there is no evidence that the Westlake officers engaged in willful misconduct while operating their cruisers. There was testimony that they responded to the dispatch call out of an obligation as officers to help in any way possible, and that the safety of the public was their "top priority" or "primary concern." Even assuming arguendo that the officers should not have responded to the dispatch call or should not have parked their cruisers in the roadway, "'a mere error of judgment' ordinarily does not constitute willful misconduct." *Hoffman* at ¶ 43, quoting *Tighe* at paragraph three of the syllabus. With regard to Officer Arcuri's deployment of stop sticks, the Supreme Court of Ohio has held "'the exception to immunity in R.C. 2744.02(B)(1) for the negligent operation of a motor vehicle *pertains only to negligence in driving or otherwise causing the vehicle to be moved*.'" (Emphasis added.) *McConnell v. Dudley*, 158 Ohio St.3d 388, 2019-Ohio-4740, ¶ 27, quoting *Doe v. Marlington Local School Dist. Bd. of Edn.*, 122 Ohio St.3d 12, 2009-Ohio-1360, ¶ 26.

**{¶43}** Accordingly, when reviewing the evidence and all reasonable inferences in a light most favorable to the Plaintiffs-Appellants, we conclude that no genuine issue as to any material fact remains to be litigated, and the cities of both Avon and Westlake are entitled to judgment as a matter of law. Plaintiffs-Appellants did not allege in their complaint that the officers' operation of their cruisers constituted wanton misconduct; and because reasonable minds could only conclude that the officers' operation of their cruisers did not constitute willful misconduct, we need not proceed to the third tier of the analysis, and the cities are entitled to immunity and summary judgment. *See* R.C. 2744.02(B)(1)(a).

{¶44} We certainly empathize with Plaintiffs-Appellants' plight and can appreciate the magnitude of the injuries they suffered as a result of this unfortunate accident, but we are compelled to affirm the judgment of the trial court in this matter. Plaintiffs-Appellants' first and second assignments of error are therefore overruled.

III.

{¶45} Plaintiffs-Appellants' first and second assignments of error are both overruled. The judgment of the Lorain County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellants.

THOMAS A. TEODOSIO
FOR THE COURT

CARR, P. J.
CONCURS IN JUDGMENT ONLY.

HENSAL, J.
CONCURRING IN PART, AND DISSENTING IN PART.

{¶46} I respectfully dissent from the majority's judgment to the extent it concludes that Officer Arcuri was entitled to judgment as a matter of law. I believe that, viewing the evidence in a light most favorable to plaintiffs, there is a genuine issue whether his conduct was reckless.

{¶47} The definition of reckless under Section 2744.03(A)(6)(b) has had a convoluted history. In *Fabrey v. McDonald Village Police Dept.*, 70 Ohio St.3d 351 (1994), the Ohio Supreme Court considered whether a police chief had acted in a wanton or reckless manner under Section 2744.03(A)(6). *Id*. at 356. The Court first considered the term "wanton" and noted that it had previously held that wanton misconduct was "the failure to exercise any care whatsoever." *Id*. It also explained that "'mere negligence is not converted into wanton misconduct unless the evidence establishes a disposition to perversity on the part of the tortfeasor.' Such perversity must be under such conditions that the actor must be conscious that his conduct will in all probability result in injury." *Id*., quoting *Roszman v. Sammet*, 26 Ohio St.2d 94, 96-97 (1971). It then turned to defining recklessness and explained that it had previously employed the standard from the Restatement of Torts that an actor's conduct is in reckless disregard of the safety of others if such risk is substantially greater than that which is necessary to make his conduct negligent. *Id*.

{¶48} In *O'Toole v. Denihan*, 118 Ohio St.3d 374, 2008-Ohio-2574, the Ohio Supreme Court again considered when the employee of a political subdivision can be liable under Section

2744.03(A)(6)(b). After stating the definition of reckless from the Restatement, the Court wrote that "[d]istilled to its essence, and in the context of R.C. 2744.03(A)(6)(b), recklessness is a perverse disregard of a known risk." *Id*. at ¶ 73. In support of that statement the Court cited *Fabrey*, even though the only language addressing perversity in *Fabrey* concerned the standard for wanton conduct, not reckless conduct. *Id*., citing *Fabrey* at 356. The Court, quoting *Fabrey*, also wrote that recklessness required that "the actor must be conscious that his conduct will in all probability result in injury." *Id*. at ¶ 74, quoting *Fabrey* at 356. Again, that language quoted from *Fabrey* concerned wantonness and relied on another decision that had addressed wantonness. *Fabrey* at 356, quoting *Roszman* at 97.

{¶49} In *Anderson v. Massillon*, 134 Ohio St.3d 380, 2012-Ohio-5711, the Ohio Supreme Court clarified the definitions of willful, wanton, and reckless conduct. It noted that its cross-application of the terms in earlier cases had led some appellate courts to conclude that the terms were functionally equivalent. *Id*. at ¶ 30. It disavowed that understanding, however, and specifically held that the three terms "describe different and distinct degrees of care and are not interchangeable." *Id*. at paragraph one of the syllabus. Regarding wanton misconduct, the Court explained that it "is the failure to exercise any care toward those to whom a duty of care is owed in circumstances in which there is great probability that harm will result." *Id*. at paragraph three of the syllabus. It also explained that a "disposition to perversity" had once been part of the definition of wanton misconduct, but that the element had been abandoned decades earlier. *Id*. at ¶ 28, citing *Hawkins v. Ivy*, 50 Ohio St.2d 114, 117 (1977). In defining reckless conduct, the Court defined reckless conduct as "characterized by the conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is

substantially greater than negligent conduct[,]" specifically adopting the Restatement's definition of the term. *Id*. at paragraph four of the syllabus.

{¶50} In *Argabrite v. Neer*, 149 Ohio St.3d 349, 2016-Ohio-8374, the Ohio Supreme Court initially identified the definitions it outlined in *Anderson* as the controlling law. *Id*. at ¶ 8. When it proceeded to address whether specific employees had acted recklessly, however, it wrote, quoting *O'Toole*, that "[r]ecklessness requires knowledge by the actor that his 'conduct will in all probability result in injury.'" *Id*. at ¶ 21, quoting *O'Toole* at paragraph three of the syllabus; *see also id.* at ¶ 25, 30. It did not apply the *Anderson* standard it had initially quoted as the applicable rule.

{¶51} In *A.J.R. v. Lute*, 163 Ohio St.3d 172, 2020-Ohio-5168, the Ohio Supreme Court noted that, in applying Section 2744.03(A)(6)(b), it had defined recklessness as "a perverse disregard of a known risk[,]" *Id*. at ¶ 17, quoting *O'Toole* at paragraph three of the syllabus. It also wrote that "[r]ecklessness * * * necessarily requires something more than mere negligence. The actor must be conscious that his conduct will in all probability result in injury." *Id*., quoting *O'Toole* at paragraph three of the syllabus. Quoting *Anderson*, however, the Court also noted that it had explained that reckless conduct is "characterized by the conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct." *Id*., quoting *Anderson* at paragraph four of the syllabus. It ended up treating the phrase "conscious that [their] conduct [would] in all probability result in injury" as the equivalent of "'conscious disregard of or indifference to' the risk of physical harm to [victim] 'that [was] unreasonable under the circumstances.'" *Id* at ¶ 23, quoting *O'Toole* at paragraph three of the syllabus, *Anderson* at paragraph four of the syllabus.

{¶52} Most recently in *Maternal Grandmother v. Hamilton County Department of Job and Family Services*, __ Ohio St.3d __, 2021-Ohio-4096, the Ohio Supreme Court employed only the definition from *Anderson* to explain what constitutes reckless conduct. *Id*. at ¶ 8. After outlining the requirements for wanton misconduct, the Court proceeded to discuss reckless conduct, which it defined as "the conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances." *Id*., quoting *Anderson* at ¶ 34. The Court only cited *O'Toole* for the proposition that both wanton misconduct and reckless conduct involve "something more than mere negligence." *Id*., quoting *O'Toole* at paragraph three of the syllabus. The Court also applied only *Anderson*'s reckless conduct standard when it determined whether the complaint in the case pleaded sufficient facts, concluding that the complaint alleged that the defendant caseworkers "disregarded or were indifferent to a known or obvious risk of harm to [the decedent] that was unreasonable under the circumstances." *Id*. at ¶ 14.

{¶53} The requirement first stated in *O'Toole* that an actor be conscious that their conduct will in all probability result in injury originates from the Ohio Supreme Court's definition of wanton misconduct, not its original understanding of reckless conduct. *Roszman* at 423, citing *Universal Concrete Pipe Co. v. Bassett*, 130 Ohio St.3d 567 (1936), paragraph two of the syllabus. The two definitions, equated by the Court in *Lute*, are not commensurate. There are differences in the type and quantum of evidence needed to prove that someone was conscious that his conduct would probably result in injury compared to the type and quantum of evidence needed to prove that someone had a conscious disregard or indifference to a known or obvious risk of harm to another that was unreasonable under the circumstances. For the first standard, the plaintiff must show that the defendant had actual knowledge that his conduct would probably

result in actual injury to others. Under the second standard, however, the plaintiff does not need to show that the defendant knowingly disregarded a risk and does not even need to show that the defendant had actual knowledge of the risk. Instead, the risk of harm need only be obvious under the circumstances, implying that the defendant only "should have known" about the risk. Accordingly, I would follow the example of *Maternal Grandmother* and not apply the *O'Toole* standard to the facts of this case.

{¶54} Applying *Anderson*'s and the Restatement's definition of recklessness, the issue is whether Officer Arcuri's actions were "characterized by the conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct." *Anderson* at paragraph four of the syllabus. There is evidence in the record that shows Officer Arcuri violated multiple departmental policies while responding to the situation, including his department's guidelines regarding stop stick deployment. Although the officer testified that he did not believe the truck would crash into the tavern, he said that he was not surprised when the suspect lost control after hitting the stop sticks because it was travelling, in his estimation, over 80 miles per hour. He was also aware that Officer Fox was somewhere behind him and he could have observed the multiple occupied vehicles stopped in the eastbound lane. Because he blocked the middle lane with his own vehicle, this effectively left the oncoming traffic lane as the only unobstructed lane of travel. He had also had experience deploying stop sticks and knew that a suspect might swerve to avoid them, causing the suspect to lose control and go off the roadway. Viewing the facts in a light most favorable to plaintiffs, reasonable minds could differ as to whether Officer Arcuri's actions amounted to a conscious disregard of or indifference to a known or obvious risk of harm to another that was unreasonable under the circumstances and was substantially greater

than negligent conduct. As such, I would conclude that Officer Arcuri was not entitled to immunity under Section 2744.03(A)(6)(b) as a matter of law and that the trial court erred in granting summary judgment in his favor. I, therefore, respectfully concur in the majority's judgment in part and dissent in part.

APPEARANCES:

NICHOLAS A. DICELLO and KEVEN C. HULICK, Attorneys at Law, for Appellants.

HAMES A. CLIMER, FRANK H. SCIALDONE, JOHN D. PINZONE, and AMILY A. IMBROGNO, Attorneys at Law, for Appellees.

JAMES POPSON and ASHLEY C. WAKEFIELD, Attorneys at Law, for Appellees.

MICHAEL P. MALONEY, Director of Law, and ROBIN R. LEASURE, Assistant Director of Law, for Appellees.