[Cite as *Huber v. State Farm Mut. Auto Ins. Co.*, 2022-Ohio-3022.]

| | | |
|---|---|---|
| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

JEFFREY HUBER

     Appellee

     v.

STATE FARM MUTUAL AUTO
INSURANCE CO., et al.

     Appellee

     v.

VILLAGE OF BOSTON HEIGHTS AND
MICHAEL TAYLOR

     Appellants

C.A. No.     29962

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No.    CV-2019-10-3755

DECISION AND JOURNAL ENTRY

Dated: August 31, 2022

SUTTON, Judge.

**{¶1}** Third-party Defendants-Appellants Village of Boston Heights Police Department ("Boston Heights") and Boston Heights Police Officer Michael Taylor ("Officer Taylor") appeal from the judgment of the Summit County Court of Common Pleas. For the reasons that follow, this Court reverses and remands for further proceedings.

I.

**Background**

{¶2} This appeal arises out of an April 21, 2018, vehicle collision involving Boston Heights Police Officer Michael Taylor and Plaintiff-Appellee, Jeffrey Huber. The accident occurred when Officer Taylor was responding to an emergency call for a motor vehicle crash on Boston Mills Road in the Village of Boston Heights. While responding to the crash scene, Officer Taylor proceeded through a red light at the end of the Route 8 exit ramp at the intersection of Hines Hill Road and Dean Memorial Parkway and collided with a pickup truck driven by Mr. Huber.

{¶3} Mr. Huber subsequently filed a complaint against his insurance company, Defendant-Appellee State Farm Mutual Automobile Insurance Company ("State Farm"). Mr. Huber's initial complaint maintained that Officer Taylor was entitled to statutory immunity and indicated Mr. Huber was seeking uninsured motorist benefits from State Farm. After Mr. Huber filed his complaint, State Farm filed a third-party complaint, adding Officer Taylor and Boston Heights as third-party defendants to the matter. Mr. Huber then amended his complaint to allege that Officer Taylor operated his vehicle in a willful, wanton, or reckless manner. Extensive discovery and several witness depositions followed.

**Summary Judgment Motions**

{¶4} On November 13, 2020, Officer Taylor and Boston Heights filed a joint motion for summary judgment on the grounds that both Officer Taylor and Boston Heights were entitled to immunity under R.C. 2744.02 and R.C. 2744.03(A). Specifically, the motion stated that Officer Taylor's operation of his police cruiser did not constitute willful, wanton, or reckless conduct because the undisputed evidence established Officer Taylor was responding to an emergency call at the time of the accident, Officer Taylor's emergency lights and siren were activated at the time of the accident, Officer Taylor had slowed his vehicle before entering the intersection, and Officer Taylor was traveling at a speed of no more than 31 m.p.h. at the time of the accident.

{¶5} In support of their motion for summary judgment, Officer Taylor and Boston Heights included an affidavit and expert report of accident reconstructionist Richard L. Stanford II, P.E.; affidavits from two eyewitnesses, Nicole Jones and Marc Roberts; an affidavit from forensic engineer Kurt Whitling, P.E.; and event data recorder (EDR) data that Mr. Whitling obtained from Officer Taylor's vehicle. Previously, they had also filed a deposition of Mr. Huber with the trial court.

{¶6} Mr. Huber responded in opposition to the motion for summary judgment, arguing that genuine issues of material fact existed as to whether Officer Taylor and Boston Heights were entitled to statutory immunity. Specifically, Mr. Huber argued Officer Taylor failed to activate his siren, accelerated through the intersection, and violated the written Boston Heights Police Department policy. Mr. Huber did not present any affidavits or witness testimony in support of his opposition to summary judgment. Mr. Huber did, however, include pictures of the vehicles after the accident; a picture of the intersection where the crash occurred; a copy of Boston Heights department policy; a written warning Officer Taylor received from his department; and a DVD with video clips from Officer Taylor's dashboard camera.

{¶7} State Farm also responded in opposition, arguing that Officer Taylor and Boston Heights were not entitled to statutory immunity. Like Mr. Huber, State Farm argued that whether or not Officer Taylor's conduct was willful, wanton, or reckless was a question of fact for the jury to determine. State Farm presented no new evidence or affidavits in support of its response in opposition.

## Summary Judgment Evidence

**{¶8}** The extensive discovery in the record included deposition testimony, expert reports, eyewitness affidavits, data obtained from Officer Taylor's vehicle, video recordings from Officer Taylor's dashboard camera, and Boston Heights Police Department policies.

Deposition of Officer Michael Taylor

**{¶9}** Officer Taylor stated on April 21, 2018, he was headed north on Route 8 when a call came over the radio from Cuyahoga Falls dispatch requesting that his partner respond to a motor vehicle crash at Boston Mills Road. Because Officer Taylor's partner was in a separate vehicle in a different part of Boston Heights and Officer Taylor was closer to the location, Officer Taylor responded. Upon receiving the call, Officer Taylor used an emergency vehicle crossover to make a U-turn and headed south on Route 8 towards the Hines Hill Road exit.

**{¶10}** As Officer Taylor drove south on Route 8 toward the Hines Hill Road exit, he passed several vehicles to his right both on the highway and the exit. As he entered the exit ramp, he slowed his speed as he approached the intersection. Officer Taylor stated he had both his overhead lights and siren on. He further stated his siren has three different sounds it can make: a "wail" siren, a "priority" siren, and a "chirp" siren. Officer Taylor did not recall which sound he was using when he entered the intersection, but he believed that he cycled through all three sounds as he proceeded down the exit ramp and into the intersection.

**{¶11}** As he approached the intersection, Officer Taylor slowed for a minivan to clear the intersection and saw a silver Dodge Charger stop and yield to his flashing lights. Officer Taylor stated he did not come to a complete stop at the red light before proceeding through it, but he "proceeded through the intersection thinking everyone had seen [him]." He also stated he did not

see Mr. Huber's pickup truck approaching the intersection, and that if he had seen Mr. Huber, he would have come to a complete stop.

{¶12} As Officer Taylor entered the intersection, his cruiser was struck on the front passenger side by Mr. Huber's pickup truck. Officer Taylor said that while he never saw Mr. Huber before impact, he heard the squeal of Mr. Huber's tires immediately before impact.

{¶13} Officer Taylor stated he did not remember much after the crash. He remembered immediately calling for an ambulance due to the severity of the crash, and that Macedonia police officers responded to the crash scene. Officer Taylor was transported by ambulance to a local hospital, was treated for his injuries, and released that evening.

{¶14} The Ohio State Highway Patrol conducted an investigation into the crash. Officer Taylor stated he was issued a traffic citation by the Ohio State Highway Patrol, but that the citation was later dropped after the Stow Municipal Court found the ticket was invalid.

{¶15} With respect to the video from his dashboard camera, Officer Taylor stated he had been having problems with the camera not working properly. Although his dashboard camera was supposed to activate if he activated his overhead lights, if the vehicle experienced an impact, or if the vehicle's speed exceeded 90 m.p.h., Officer Taylor said that he had been experiencing "multiple problems" with his camera on "multiple occasions." Officer Taylor stated that these problems included the dashboard camera "randomly shutting off, memory cards being full, [the cameras] not recording, the cameras [] not activating, [and] the information on the dash cameras themselves not being accurate."

<u>Deposition of Plaintiff Jeffrey Huber</u>

{¶16} On the afternoon of the accident, after checking out a job site for the upcoming week, Mr. Huber drove east on Hines Hill Road. As he passed the traffic light at the Costco store

on Hines Hill Road, the traffic light at the next intersection, which was the intersection of Hines Hill Road, the Route 8 exit ramp, and Dean Memorial Parkway, turned green. Mr. Huber stated as he approached the intersection, he saw two vehicles in front of him also traveling east on the single lane road. The first vehicle passed through the traffic light and pulled over to the side of the road after clearing the intersection. Mr. Huber stated that the vehicle directly in front of him slowed down through the intersection and cleared the intersection.

{¶17} The traffic light was green, and Mr. Huber proceeded through the intersection. Mr. Huber stated as he was traveling through the intersection, he saw the vehicle driven by Officer Taylor about to hit his pickup truck. Mr. Huber stated, at that point, there was nothing he could do to avoid impact with the police vehicle. The left front driver's side of his truck made contact with Officer Taylor's vehicle. As a result of the impact, Mr. Huber's airbags were deployed, and his left shoulder struck his driver's side door. Mr. Huber sustained injuries in the crash, including a broken clavicle and a cracked rib.

{¶18} Mr. Huber was transported by EMS to a local hospital. He was treated and released that evening with his arm in a sling. As a result of the accident, Mr. Huber stated he experiences ongoing, periodic pain in the back of his neck, in his shoulders, and in his rib area.

{¶19} When asked whether he heard a police siren before impact, Mr. Huber stated: "I heard [what] I want to call [] a whoop, like a whoop, and that was a split second before [Officer Taylor] hit me." Mr. Huber stated that the overhead emergency lights were activated on Officer Taylor's vehicle, but that he did not see the lights until a split second before impact.

{¶20} Mr. Huber estimated his own speed at approximately 30-35 m.p.h., either at or below the posted speed limit of 35 m.p.h. Based on the damage to his vehicle, and where his vehicle ended up after the crash, Mr. Huber stated that it was his opinion that Officer Taylor was

traveling at a much higher rate of speed than he was. However, Mr. Huber conceded that this belief was his opinion and that he had no knowledge or training in accident reconstruction.

Deposition of Sergeant Chad McArdle

{¶21} At the time of the accident, Sergeant Chad McArdle was Officer Taylor's direct supervisor at the Boston Heights Police Department. Sergeant McArdle stated he supervised the training of all new officers, including Officer Taylor. All new officers complete a 240-hour field training program once they are sworn in with the Boston Heights Police Department in order to receive field training specific to that agency. As part of that field training program, new officers spend two to three weeks in the field with Sergeant McArdle, and then rotate through other officers on the force for the remainder of the training.

{¶22} As part of his role as Officer Taylor's supervisor, Sergeant McArdle conducted his own review of the accident. Sergeant McArdle stated that police officers at his agency are trained to respond to all calls as if the call involves an injury unless told otherwise by the dispatcher. As part of his review, he requested and received the audio file from the 911 call from the accident on Boston Mills Road to which Officer Taylor was responding, as well as the audio file of the radio conversation between the dispatcher and Officer Taylor. Sergeant McArdle stated the 911 caller, a woman, told the dispatcher she had rear ended someone on Boston Mills Road. She told the dispatcher she was not injured, but that she did not know the status of the person in the car she hit. Sergeant McArdle stated that no information about whether or not anyone was injured in the accident to which Officer Taylor was responding was relayed to Officer Taylor.

{¶23} Because the use of emergency overhead lights and a siren can sometimes make traffic worse, Sergeant McArdle stated that he trains and instructs officers in his agency to use their lights and siren "strategically." He stated that officers are not required to constantly use their

lights and siren, especially in cases where an officer believes their use is becoming a burden to the safety of others. Sergeant McArdle explained that often other drivers do not know how to respond to an officer's lights and siren, and in some cases, it can cause additional accidents. Sergeant McArdle stated that the use of the emergency overhead lights and the siren is not mandatory and can sometimes make traffic worse. He described an officer's decision as to whether or not overhead lights and the siren should be deployed as being situation specific and at the discretion of the individual police officer.

{¶24} As part of his investigation, Sergeant McArdle reviewed the dashboard camera video clips from Officer Taylor's vehicle and offered his opinion as to why three different dashboard camera clips existed and why none of those clips captured Officer Taylor proceeding up the ramp. Sergeant McArdle described three different scenarios where this dashboard camera video system is activated: when the police vehicle speed reaches 90 m.p.h., when the officer manually activates his overhead lights, and when the system detects that the police vehicle has been involved in a collision.

{¶25} Based on his knowledge and experience with the camera system and the footage that he watched, Sergeant McArdle stated he believed Officer Taylor's camera initially activated at the 30 second mark of the first dashboard camera video clip because Officer Taylor reached a speed of 90 m.p.h. on Route 8 as he headed south to respond to the emergency call. Sergeant McArdle stated he believed the first video clip ended when Officer Taylor activated his overhead lights, and once Officer Taylor activated his overhead lights, the system would have required Officer Taylor to touch the screen to assign a tag to the first clip before the system would begin recording again. Sergeant McArdle explained:

> [I]t forces us to manually tag that video, so while we're driving, we have to look
> away real quick, tag that video, and what [the dashboard camera system] does is []

re-boot that process and it's going to look 30 seconds back to begin the new recording. So maybe it took him 13 seconds to tag it, and then that's why we have the missing 30-second gap, because it's trying to – to recycle, and then [Officer Taylor is] involved in the traffic crash and [the system] is supposed to capture the traffic crash as the most important piece of evidence.

Sergeant McArdle also explained why he believed the dashboard camera did not capture Officer Taylor proceeding down the ramp and entering the intersection:

I will speculate that [Officer Taylor] activated his lights, at which point in time it's going to force him to tag the previous video from him going 90, and it's going to restart that 30-second lookback period. And then, I believe, due to the impact, it's going to capture that impact as it's supposed to and delete [Officer Taylor] coming up the off ramp. * * * [I]t's made to capture the impact more than anything.

{¶26} Regarding Officer Taylor's siren, Sergeant McArdle stated that a wailing siren can be manually overridden to chirp the siren when entering an intersection. Sergeant McArdle stated that in the post-impact video clip, Officer Taylor's siren is loudly and audibly heard. Based on his knowledge and experience of how the siren functions, Sergeant McArdle stated he believed Officer Taylor had likely activated the siren as he exited the ramp right before reaching the intersection, manually overrode the wailing siren to create the chirping sound as he proceeded through the intersection, and the siren system reverted back to the wailing siren after impact, as heard on the post-impact video clip.

Affidavit of Eyewitness Nicole Jones

{¶27} Nicole Jones was an eyewitness to the accident between Officer Taylor and Mr. Huber. On April 21, 2018, she was a front seat passenger in a vehicle that was stopped in the east bound lane of Hines Hill Road, in the right turn lane at the intersection of Hines Hill Road, the Route 8 exit ramp, and Dean Memorial Parkway. Ms. Jones stated that as the traffic light turned green, she could see Officer Taylor's police cruiser headed south on the Route 8 exit ramp. She observed Officer Taylor had his overhead emergency lights and siren activated. Ms. Jones stated

it appeared that Officer Taylor was responding to an emergency call, so her vehicle remained stopped and did not enter into the intersection in order to allow Officer Taylor to pass through the intersection.

**{¶28}** Ms. Jones stated that she observed Officer Taylor slowing down, prior to him entering the intersection. She estimated his speed to be between 20-30 m.p.h. when he entered the intersection with both his overhead emergency lights and siren activated. She then witnessed Officer Taylor enter the intersection and saw Mr. Huber's pickup truck collide with the police vehicle.

Affidavit of Eyewitness Marc Roberts

**{¶29}** Marc Roberts was also an eyewitness to the crash. Mr. Roberts stated he was driving south bound on Route 8 towards the Hines Hill Road exit. As he approached the Hines Hill exit on Route 8, he noticed Officer Taylor's police vehicle in the lane next to him. Mr. Roberts noted that the exit ramp at Hines Hill Road is long, approximately 380 yard long by his estimation. As he began exiting onto the exit ramp, he was traveling at the same speed as Officer Taylor, which Mr. Roberts estimated to be between 35-50 m.p.h. He stated the police vehicle drove alongside him for about one hundred yards and then activated its overhead emergency lights. Presuming the police officer was responding to an emergency, Mr. Roberts stated that in response to the lights he slowed his vehicle down and pulled over to the right shoulder of the exit ramp to let Officer Taylor pass him.

**{¶30}** As Officer Taylor proceeded down the ramp, Mr. Roberts could see that the traffic light at the end of the ramp was red. Mr. Roberts saw the brake lights were activated on Officer Taylor's vehicle as he approached the intersection and could see that Officer Taylor's vehicle was

slowing down. Officer Taylor then entered the intersection with Hines Hill Road and Mr. Roberts saw him collide with Mr. Huber's pickup truck.

{¶31} Mr. Roberts stated he did not hear a siren on the exit ramp prior to the accident, but also stated he remained approximately 280 yards from the intersection of the exit ramp with Hines Hill Road. Mr. Roberts also stated, in his opinion, Officer Taylor attempted to be cautious before entering the intersection.

<u>Affidavit of Kurt Whitling, P.E., and the data from the Event Data Recorder</u>

{¶32} Officer Taylor and Boston Heights submitted an affidavit from Kurt Whitling, a forensic engineer with training and experience in accident reconstruction. Mr. Whitling, employed by CED Technologies, Inc., had specific training using the BOSCH CDR tool for accessing and analyzing data recorded by the Event Data Recorder in passenger vehicles. The BOSCH CDR tool was the specific type of EDR used in Officer Taylor's vehicle. The data recorded in the EDR included the vehicle's speed prior to the crash, whether the driver deployed the brakes before the crash, and whether the driver deployed the gas pedal before the crash. The EDR data is stored in the airbag control module (ACM) of the vehicle. Mr. Whitling stated that scientific testing has shown that EDR data is widely viewed as accurate and reliable information for accident reconstruction.

{¶33} Based on the data that Mr. Whitling accessed, he stated that Officer Taylor's vehicle was traveling between 20.3 m.p.h. and 21.5 m.p.h. two seconds before the collision. Mr. Whitling stated the data indicated that Officer Taylor was traveling between 30 m.p.h. and 31.2 m.p.h. at the time of impact.

{¶34} Along with Mr. Whitling's affidavit, printouts of the EDR data obtained from the BOSCH CDR tool were submitted. Those printouts indicate that from 5 seconds before the crash

until 2.5 seconds before the crash, Officer Taylor's brakes activated, and his speed slowed from 51.2 m.p.h. to 22.5 m.p.h.  At 2 seconds before impact, Officer Taylor slowed to 20.9 m.p.h., and his foot came off the brake, and he engaged the gas pedal.  At 1.5 seconds before impact, Officer Taylor maintained the speed of 20.9 m.p.h.  At 1 second before impact, Officer Taylor's vehicle accelerated to 23.5 m.p.h. and Officer Taylor's gas pedal remained engaged and his foot was off the brake.  At 0.5 seconds before impact, as he passed through the intersection, Officer Taylor accelerated to 27.2 m.p.h. and Officer Taylor's speed at impact was recorded as 30.6 m.p.h.

### Accident Reconstruction Expert Report by Richard Stanford, P.E.

{¶35}  Officer Taylor and Boston Heights also submitted an accident reconstruction report by Richard L. Stanford, P.E.  In his report, Mr. Stanford stated that based on the measurements of the locations of the vehicles post-impact, photographs of the damage to the vehicles, and other information secured from the site of the accident, Mr. Stanford estimated that Office Taylor was traveling at a speed of 30 m.p.h. when impacted by Mr. Huber's pickup truck.  He noted that this calculation was consistent with the EDR data and the statement of eyewitness, Nicole Jones.

{¶36}  Mr. Stanford also explained that though there was a 60 m.p.h. speed posted on the display of the dashboard camera clip at the time of impact, that measurement was inaccurate and likely an erroneous recording.  Mr. Stanford stated the speed was not valid because the recorded frame also indicates that the GPS receiver had not acquired a GPS signal.  He explained the speed displayed on the video is calculated through a GPS receiver and is separate and distinct from the EDR data, which is stored in the ACM module.

{¶37}  Mr. Stanford also included a diagram that showed where Officer Taylor's vehicle was in the intersection when it made impact with Mr. Huber's truck.  The diagram shows that

Officer Taylor had crossed the westbound lane on Hines Hill Road, and was in the eastbound lane, having almost cleared the intersection, when impacted by Mr. Huber's truck.

Corrective/Disciplinary Action Report and
Boston Heights Police Department Policy

{¶38} As part of his response in opposition to summary judgment, Mr. Huber included a copy of the Boston Heights Police Department's policy on responding to emergency calls, as well as a disciplinary report belonging to Officer Taylor that was issued in relation to the crash. On May 23, 2018, a "Corrective/Disciplinary Action Report" was issued by the Boston Heights Police Department involving Officer Taylor for the April 21, 2018 incident. The report indicates that Officer Taylor received a written warning, and the report summarized the violation as follows:

> On April 21[,] 2018, Officer Michael Taylor was responding to a traffic collision that occurred on East Boston Mills Road near Chittenden Road. Officer Taylor failed from his duty to drive with due regard for the safety of all persons and property as he traveled through the intersection of East Hines Hill Road and Dean Memorial Parkway. As Officer Taylor proceeded through the intersection in which he had the red signal for, his police cruiser was struck by a pickup truck. The traffic collision resulted in injuries to a motorist as well as injuries to Officer Taylor. The motorist's vehicle sustained disabling damages. The police cruiser was totaled. Officer Taylor was found to be at fault and was cited by the Ohio State Highway Patrol for obedience to a traffic control device.

{¶39} The report indicates that Officer Taylor violated two departmental policies. Policy 307.5 is entitled "Responsibilities of Responding Officers" and states:

> Officers shall exercise sound judgment and care with due regard for life and property when responding to an emergency call. During a response to an emergency call officers may [R.C. 4511.041]: [(a)] Proceed past a red or stop signal or stop sign but only after slowing down as may be necessary for safe operation [R.C. 4511.03.]

The other policy dealt with Officer Taylor's failure to properly maintain his equipment, relative to his cruiser being totaled in the vehicle collision.

**{¶40}** The disciplinary action report also indicates that Officer Taylor had no previous disciplinary action reports on file and indicated that the corrective action plan for Officer Taylor would involve Sergeant McArdle "reviewing all applicable policies and driving tactics with Officer Taylor."

Dashboard Camera Video

**{¶41}** Included in the record were three video clips from Officer Taylor's dashboard camera.

**{¶42}** The first clip begins at 4:57:35 PM on April 21, 2018, approximately two and a half minutes before the collision, and lasts for one minute and 24 seconds, cutting out at 4:58:59 PM. The clip shows Officer Taylor completing the U-turn to head south on Route 8 towards the Hines Hill Road exit ramp, but the clip cuts out before Officer Taylor reaches the ramp. In the clip, Officer Taylor's lights do not appear to be on, and his siren does not appear to be activated. As he travels towards the Hines Hill Road Exit on Route 8, he slows down as traffic weaves in and out of the far-left lane in which Officer Taylor is traveling. The speed at which Officer Taylor is traveling appears on the display on the video, and "BRK" appears on the screen to indicate when Officer Taylor is braking and slowing down. Officer Taylor's latitude and longitude coordinates appear on the display in the video as well.

**{¶43}** The second clip begins at 4:59:47 PM on April 21, 2018. This clip only last for about two seconds. Officer Taylor appears to be in the middle of the intersection of Hines Hill Road and Dean Memorial Parkway, close to clearing the intersection. The display indicates that Officer Taylor has his overhead emergency lights on. The video contains a squealing noise and then a loud crash. The camera screen appears to crack on impact. As the vehicle makes impact, an indicator appears on the screen that indicates Officer Taylor applied his brakes. The display

appears frozen and shows only zeros for Officer Taylor's latitude and longitude coordinates, and Officer Taylor's speed appears frozen and displays at "60" during the duration of the video clip.

{¶44} The third and final clip begins at 5:00:07 PM. This clip is post-impact and lasts for about one minute and 25 seconds. The display initially still has Officer Taylor's GPS coordinates at all zeros and his speed at "60," but within the first second of the clip, GPS coordinates appear and the speed changes to "0." The display indicates that Officer Taylor's emergency overhead lights are still on, and Officer Taylor's wailing siren can be heard.

### Trial Court's Decision

{¶45} On March 26, 2021, the trial court denied Officer Taylor and Boston Heights' motion for summary judgment. The court stated that a determination of whether Officer Taylor acted in a willful or wanton manner would "result in the [c]ourt taking on an impermissible role of factfinder[.]" The trial court's order failed to distinguish between the two different standards of statutory immunity for Boston Heights and Officer Taylor, and also failed to address whether or not Officer Taylor's conduct was reckless.

{¶46} It is from that order that Officer Taylor and Boston Heights appealed, assigning two errors for our review.

II.

### ASSIGNMENT OF ERROR I

**THE TRIAL COURT ERRED IN DENYING POLITICAL SUBDIVISION IMMUNITY TO THIRD-PARTY DEFENDANT-APPELLANT VILLAGE OF BOSTON HEIGHTS PURSUANT TO R.C. 2744.02.**

{¶47} In the first assignment of error, Officer Taylor and Boston Heights argue the trial court erred in denying political subdivision immunity to Boston Heights, pursuant to R.C. 2744.02,

because Officer Taylor did not operate his vehicle on the day in question in a willful or wanton manner. For the reasons that follow, this Court agrees.

## Standard of Review for Summary Judgment

{¶48} Appellate review of an award or denial of summary judgment is de novo. *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105 (1996). Summary judgment is appropriate under Civ.R. 56 when: (1) no genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) viewing the evidence most strongly in favor of the nonmoving party, reasonable minds can come to but one conclusion and that conclusion is adverse to the nonmoving party. *Temple v. Wean United*, *Inc*., 50 Ohio St.2d 317, 327 (1977), citing Civ.R. 56(C). A court must view the facts in the light most favorable to the nonmoving party and must resolve any doubt in favor of the nonmoving party. *Murphy v. Reynoldsburg*, 65 Ohio St.3d 356, 358-359 (1992). A trial court does not have the liberty to choose among reasonable inferences in the context of summary judgment, and all competing inferences and questions of credibility must be resolved in the nonmoving party's favor. *Perez v. Scripps-Howard Broadcasting Co.*, 35 Ohio St.3d 215, 218 (1988).

## R.C. 2744 – Political Subdivision Immunity

{¶49} Ohio's Political Subdivision Tort Liability Act, which governs political subdivision liability and immunity, is codified in R.C. 2744.01 et seq. *McNamara v. City of Rittman*, 125 Ohio App.3d 33, 43, (9th Dist.1998). The general rule is that political subdivisions are immune from tort liability. *Shalkhauser v. Medina*, 148 Ohio App.3d 41, 46 (9th Dist.2002). "In order to determine whether a political subdivision is immune from liability, we engage in a three-tiered

analysis."[1] *Moss v. Lorain Cty. Bd. of Mental Retardation*, 9th Dist. Lorain No. 13CA010335, 2014-Ohio-969, ¶ 10, citing *Cater v. Cleveland*, 83 Ohio St.3d 24, 28 (1998).

{¶50} The first tier involves the general grant of immunity to political subdivisions by R.C. 2744.02(A)(1), which provides that: "'a political subdivision is not liable in damages in a civil action for injury, death, or loss to person or property allegedly caused by any act or omission of the political subdivision or an employee of the political subdivision in connection with a governmental or proprietary function.'" *McConnell v. Dudley*, 158 Ohio St.3d 388, 2019-Ohio-4740, ¶ 21, quoting R.C. 2744.02(A)(1).

{¶51} Second, "this comprehensive immunity can be abrogated pursuant to any of the five exceptions set forth at R.C. 2744.02(B)." *Shalkhauser* at 46. "As part of this second tier, the court may also have to consider whether any of the specific defenses to liability for negligent operation of a motor vehicle listed in R.C. 2744.02(B)(1)(a) through (c) apply." *McConnell* at ¶ 22. Relevant to this case is R.C. 2744.02(B)(1)(a), which provides immunity for law-enforcement officers operating a motor vehicle and responding to an emergency call from liability for any injuries resulting from the negligent operation of the motor vehicle, so long as "the operation of the vehicle did not constitute willful or wanton misconduct * * *." The terms "willful" and "wanton" describe different and distinct degrees of care and are not interchangeable. *Anderson v. Massillon*, 134 Ohio St.3d 380, 2012-Ohio-5711, paragraph one of the syllabus. "Willful misconduct implies an intentional deviation from a clear duty or from a definite rule of conduct, a deliberate purpose not to discharge some duty necessary to safety, or purposefully doing wrongful acts with knowledge or appreciation of the likelihood of resulting injury." *Id*. at paragraph two of the syllabus. "Wanton

---

[1] We note that the three-tiered analysis used to determine political subdivision immunity, pursuant to R.C. 2744.02, is different from the standard used to determine whether an employee of a political subdivision has immunity, which is codified in R.C. 2744.03.

misconduct is the failure to exercise any care toward those to whom a duty of care is owed in circumstances in which there is great probability that harm will result." *Id.* at paragraph three of the syllabus.

**{¶52}** If any one of the five exceptions to immunity in R.C. 2744.02(B) applies and if any defenses that may be asserted by the political subdivision under R.C. 2744.02(B)(1) do not apply, then the court's analysis proceeds to the third tier. *McConnell* at ¶ 23. In the third tier of the analysis, "immunity may be restored, and the political subdivision will not be liable, if one of the defenses enumerated in R.C. 2744.03(A) applies." *Moss* at ¶ 10.

**{¶53}** We note that it is undisputed here that the Village of Boston Heights is a political subdivision of the State of Ohio, and that Officer Taylor, a Boston Heights police officer, was an employee of the village. *See* R.C. 2744.01(F) (defining "political subdivision"); R.C. 2744.01(B) (defining "employee"). Moreover, "[t]he provision or nonprovision of police * * * services or protection" is a "governmental function." *See* R.C. 2744.01(C)(2)(a).

### Question of Law Presented

**{¶54}** In the case *sub judice,* the parties do not dispute that Officer Taylor and Boston Heights are entitled to a presumption of immunity. Appellees conceded at oral argument, and the record indicates, that Officer Taylor was responding to an emergency call within the meaning of R.C. 2744.02(B)(1)(a).

**{¶55}** Instead, the parties dispute whether the evidence establishes the existence of a genuine issue of material fact regarding whether Officer Taylor operated his vehicle in a willful or wanton manner so as to remove the presumption of immunity to which Boston Heights is entitled. Ohio courts have long recognized that a party seeking to exercise a statutory exception bears the burden of demonstrating that exception. *See State ex rel. Nat. Broadcasting Co., Inc. v. City of*

*Cleveland*, 38 Ohio St.3d 79, 83 (1988) ("Under Ohio law, a person asserting an exception is required to prove the facts warranting such an exception"). Further, this Court recognized that idea in the context of summary judgment in *Anderson v. Westlake*, 9th Dist. Lorain No. 19CA011512, 2021-Ohio-4582, ¶ 8, citing Dresher v. Burt, 75 Ohio St.3d 280, 293 (1996), stating:

> [A] party seeking summary judgment, on the ground that the nonmoving party cannot prove its case, bears the initial burden of informing the trial court of the basis for the motion, and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact on the essential element(s) of the nonmoving party's claims. The moving party cannot discharge its initial burden under Civ.R. 56 simply by making a conclusory assertion that the nonmoving party has no evidence to prove its case. Rather, the moving party must be able to specifically point to some evidence of the type listed in Civ.R. 56(C) which affirmatively demonstrates that the nonmoving party has no evidence to support the nonmoving party's claims. If the moving party fails to satisfy its initial burden, the motion for summary judgment must be denied. However, if the moving party has satisfied its initial burden, the nonmoving party then has a reciprocal burden outlined in Civ.R. 56(E) to set forth specific facts showing that there is a genuine issue for trial and, if the nonmovant does not so respond, summary judgment, if appropriate, shall be entered against the nonmoving party.

*Anderson* at ¶ 8, Thus, for this assignment of error, our analysis will focus upon whether the nonmoving parties, Mr. Huber and State Farm, have met their burden of pointing to evidence in the record that creates a genuine issue of material fact concerning whether Officer Taylor operated his vehicle in a willful or wanton manner in order to rebut the presumption of immunity to which Officer Taylor and Boston Heights are entitled pursuant to statute.

<u>Definition of Willful Misconduct</u>

**{¶56}** "Willful misconduct implies an intentional deviation from a clear duty or from a definite rule of conduct, a deliberate purpose not to discharge some duty necessary to safety, or purposefully doing wrongful acts with knowledge or appreciation of the likelihood of resulting injury." *Anderson*, 134 Ohio St.3d 380, at ¶ 32, citing *Tighe v. Diamond*, 149 Ohio St. 520 (1948), and Black's Law Dictionary 1630 (8th Ed.2004) (describing willful conduct as the voluntary or

intentional violation or disregard of a known legal duty). In the automobile context, the Ohio Supreme Court, in *Tighe*, has explained that willful misconduct generally contemplates:

> either the doing of an act with specific intent to injure [another], or, with full knowledge of existing conditions, the intentional execution of a wrongful course of conduct which he knows should not be carried out or the intentional failure to do something which he knows should be done in connection with his operation of the automobile, under circumstances tending to disclose that the motorist knows or should know that an injury to [another] will be the probable result of such conduct.

*Id.* at 527-28. Thus, "a mere error of judgment" ordinarily does not constitute willful misconduct. *Id.* at paragraph three of the syllabus.

### Definition of Wanton Misconduct

{¶57} Wanton misconduct means "'the failure to exercise any care toward those to whom a duty of care is owed in circumstances in which there is great probability that harm will result.'" *Argabrite v. Neer*, 149 Ohio St.3d 349, 2016-Ohio-8374, ¶ 8, quoting *Anderson* at paragraph three of the syllabus; *accord Hawkins v. Ivy*, 50 Ohio St.2d 114 (1977), syllabus ("Where the driver of an automobile fails to exercise any care whatsoever toward those to whom he owes a duty of care, and his failure occurs under circumstances in which there is great probability that harm will result, such failure constitutes wanton misconduct."). *See also Tighe* at 526 (defining wanton misconduct as "an entire absence of all care for the safety of others and an indifference to the consequences").

{¶58} A court that is determining whether a defendant engaged in wanton misconduct thus essentially applies a two-part test. *See Matkovich v. Penn Cent. Transp. Co.*, 69 Ohio St.2d 210, 212 (1982) (explaining that determining whether railroad-defendant in personal injury action engaged in wanton misconduct involves a two-part test); *accord Thompson v. Smith*, 178 Ohio App.3d 656, 2008-Ohio-5532 (11th Dist.), ¶ 40 (applying *Matkovich'*s two-part test in statutory immunity case). The first question is whether the defendant failed to exercise any care whatsoever toward those to whom he owes a duty of care. *Matkovich* at 212. This "requires that we determine

the duty [the defendant] owed [to the plaintiff], and also the extent of care" that the defendant exercised. *Id*. The second question is whether the failure to exercise any care created a great probability that harm will result. *Id*. This requires courts to "consider the nature of the hazard created by the circumstances." *Id*. Furthermore, we note that, in general, a defendant's "minimal efforts to warn [are] sufficient to overcome the allegation of wanton misconduct." *Id.*, citing *Pisel v. Baking Co.*, 61 Ohio St.2d 142 (1980).

<u>Relevant Factors in Determining Willful, Wanton, or Reckless Conduct</u>

{¶59}  This Court has identified many factors that may be relevant when determining if a law enforcement officer operated a motor vehicle willfully, wantonly, recklessly, or simply negligently. *See Anderson*, 2021-Ohio-4582, at ¶ 15.  These factors include, but are not limited to:

> (1) the officer's speed; (2) whether the officer was traveling in the correct lane of travel; (3) whether the officer had the right-of-way; (4) the time of day; (5) the weather; (6) the officer's familiarity with the road; (7) the road contour and terrain; (8) whether traffic was light or heavy; (9) whether the officer made invasive maneuvers (i.e., attempting to force the vehicle from the road) or evasive maneuvers (i.e., attempting to avoid a collision); (10) the nature and seriousness of the offense that prompted the emergency; (11) whether the officer possessed a safer alternative; (12) whether the officer admitted to disregarding the consequences of his actions; (13) whether the officer activated the vehicle's lights and siren[ ]; and (14) whether the officer violated any applicable departmental policy.

*Id.* at ¶ 15, citing *Hoffman v. Gallia Cty. Sheriff's Office,* 4th Dist. Gallia No. 17CA2, 2017-Ohio-9192, ¶ 37.  No one factor is determinative; rather, we must instead consider the totality of the circumstances surrounding the incident. *Id*.

<u>Consideration of *Hoffman* factors</u>

*Violation of Boston Heights Policy*

{¶60}  Boston Heights Police Department Policy 307.5 states that during an emergency call, an officer may "proceed past a red or stop signal [] only after slowing down as may be

necessary for safe operation[.]" After conducting an investigation, the police department issued a written warning to Officer Taylor on the grounds that he violated this policy. However, as this Court stated in *Anderson*, "[e]vidence of a policy violation *demonstrates negligence*, at best, unless there is evidence the actor has knowledge that his conduct will in all probability result in injury.*"* (Emphasis added.) *Anderson* at ¶ 31, citing *Agrabrite* at ¶ 21. Here, neither Mr. Huber nor State Farm has presented any evidence in the record demonstrating that Officer Taylor had knowledge that his conduct would in all probability result in the injury.

*Officer Taylor's Siren*

{¶61} Mr. Huber and State Farm point to what they assert is evidence that Officer Taylor failed to activate his siren. Mr. Huber points to the fact that the siren is not heard in the approximately two-second-long video clip containing the impact and the one eyewitness who stated he "did not hear" the siren. Both parties argue that this creates an inference that Officer Taylor did not have his siren on when he entered the intersection.

{¶62} However, this ignores that the affidavit of the eyewitness who stated he "did not hear" a siren also stated that he remained several hundred yards away from the intersection and accident scene. Further, the siren is audibly blaring in the post-impact video clip, demonstrating that Officer Taylor's siren was in fact activated.

{¶63} Significantly, Sergeant McArdle offered an uncontroverted explanation of Officer Taylor's use of his siren. Sergeant McArdle stated that based on his experience with the equipment, and his review of the witness statements, he concluded that Officer Taylor activated his siren on the exit ramp just before entering the intersection. As Officer Taylor was proceeding into the intersection, he manually overrode the wailing siren to chirp the siren, and once the impact happened, was no longer able to manually override the wailing siren to chirp it, leaving the siren

loudly blaring as heard in the post-impact dashboard camera clip. Sergeant McArdle's statement that there is nothing in the system that would have caused the siren to be activated after the crash is also very relevant. Though Mr. Huber asserted at oral argument that the siren would have automatically activated due to the impact of the crash, there is no evidence in the record that indicates that statement is accurate. Sergeant McArdle offered a statement that was contrary to the assertion made by Mr. Huber. Additionally, Segreant McArdle's explanation concluding that Officer Taylor was using his siren while proceeding through the traffic light is consistent with the statement Mr. Huber made that he heard Officer Taylor's siren "chirp" right before the collision.

**{¶64}** This Court notes that there is no inconsistency, and no inference to be resolved in favor of the nonmoving party, where one witness, who remained several hundred yards back on the ramp, said "he did not hear" the officer's siren, and another witness, who was closer to the scene, stated she heard Officer Taylor's siren. In their arguments, Mr. Huber and State Farm attempt to isolate the one statement by Mr. Roberts, infer a conclusion from that statement, and assert it as a question of material fact. This Court, however, is not persuaded where the statement pointed to by Mr. Huber and State Farm does not conflict with the evidence presented by Boston Heights and Officer Taylor that Officer Taylor did in fact utilize his siren as he proceeded through the traffic light.

*Officer Taylor's Speed*

**{¶65}** Both State Farm and Mr. Huber also point to what they assert is evidence in the record to support their contention that Officer Taylor sped through the intersection. However, a review of the data indicates that Officer Taylor decelerated down the exit ramp, going from 51.2 m.p.h. at five seconds before the crash down to a speed of 20.9 m.p.h. at one and a half seconds before the crash. The data also indicates Officer Taylor's foot was on his brake up until two

seconds before the crash, and that fact is also corroborated by the eyewitness account that stated he saw Officer Taylor's brake lights activate as Officer Taylor proceeded down the ramp towards the intersection. Additionally, both experts estimate Officer Taylor's speed at impact to have been about 30 m.p.h., which was below the posted speed limit of 35 m.p.h. While State Farm appears to suggest in its brief that it was possible that Officer Taylor was going 60 m.p.h. at the time of impact, they conceded at oral argument that Officer Taylor was not going 60 m.p.h. at the time of impact.

{¶66} In a case factually similar to the case *sub judice*, the First District Court of Appeals in *Whitley v. Progressive Preferred Ins. Co.*, 1st Dist. Hamilton No. C-090240, 2010-Ohio-356, ¶ 18, found that a law enforcement officer did not operate his vehicle in a willful or wanton manner when running a red light without his siren operating. In that case, an officer ran a red light and entered an intersection at an estimated 20 to 30 m.p.h., without his siren activated. *Id*. at ¶ 4. There was conflicting testimony as to whether the officer's lights were on. *Id*. at ¶ 20. The officer struck and injured two people on a motorcycle, causing them to sustain serious injuries. *Id*. at ¶ 4. The court noted that "[a] driver of an emergency vehicle does not automatically lose immunity under R.C. Chapter 2744 by failing to activate the vehicle's lights or siren on an emergency run." *Id.* at ¶ 16. Affirming the trial court's grant of summary judgment to the agency and the officer on the basis of immunity from liability, the court found that while the officer's conduct may have been "human error" and constituted negligence, it did not constitute willful or wanton misconduct. *Id*. at ¶ 22.

{¶67} In *Stevenson v. Prettyman*, 8th Dist. Cuyahoga No. 94873, 2011-Ohio-718, the Eighth District Court of Appeals found that a plaintiff established negligence at best, but not wanton, willful, or reckless conduct in a case where an officer failed to activate his lights and siren

when running a flashing red light. *Id*. at ¶ 49. The court noted that the failure to activate his lights and siren was not dispositive and was only merely one factor to consider. Concluding that even if the officer did not have his lights and siren activated as he drove through a flashing red light, the officer drove through the flashing red light with caution, and therefore did not fail to exercise any care whatsoever and did not constitute wanton misconduct. *Id*.

<u>Officer Taylor's operation of his vehicle was not willful or wanton.</u>

{¶68} After reviewing all the evidence in the record, this Court cannot say that Officer Taylor acted with the "specific intent to injure another" to establish that he acted in a willful manner, or that Officer Taylor failed to act with any care whatsoever to establish wanton conduct. Mr. Huber and State Farm have failed to meet their burden of pointing to specific facts in the record that establish Officer Taylor operated his vehicle in a willful or wanton manner to defeat the political subdivision immunity statutorily conferred upon Boston Heights. The record indicates that Officer Taylor slowed down before entering the intersection, activated his overhead lights, and chirped his siren as he entered the intersection. Boston Heights is entitled to the statutory immunity conferred upon it by R.C. 2744.02 as a matter of law. As such, the trial court erred in denying its motion for summary judgment. Officer Taylor and Boston Heights' first assignment of error is sustained.

## ASSIGNMENT OF ERROR II

**THE TRIAL COURT ERRED IN DENYING IMMUNITY TO THIRD-PARTY DEFENDANT-APPELLANT MICHAEL TAYLOR PURSUANT TO R.C. 2744.03(A)(6).**

{¶69} In the second assignment of error, Boston Heights and Officer Taylor argue the trial court erred in denying the immunity conferred to Officer Taylor pursuant to R.C. 2744.03(A)(6),

because Officer Taylor, in responding to the emergency call, did not act in bad faith, with malicious purposes, or in a reckless or wanton manner. For the reasons that follow, we agree.

R.C. 2744.03(A)(6) – Immunity of Employees of Political Subdivision

**{¶70}** For the individual employees of political subdivisions, the three-tiered immunity analysis utilized in the first assignment of error for political subdivisions does not apply. *Rankin v. Cuyahoga Cty. Dept. of Children and Family Servs.*, 118 Ohio St.3d 392, 2008-Ohio-2567, ¶ 36. We instead look directly to R.C. 2744.03(A)(6), which prescribes immunities that an employee of a political subdivision may assert to establish nonliability in a civil action for damages allegedly caused by an act or omission in connection with a governmental or proprietary function. *Argabrite, supra,* at ¶ 7. Relevant to this case is R.C. 2744.03(A)(6)(b), which states that an employee is immune from liability unless his "acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner * * *." "This standard applies to law-enforcement officers just as it applies to other employees of political subdivisions." *Argabrite* at ¶ 7. "One acts with a malicious purpose if one willfully and intentionally acts with a purpose to cause harm." *Moss v. Lorain Cty. Bd. of Mental Retardation*, 9th Dist. Lorain No. 09CA009550, 2009-Ohio-6931, ¶ 19.

**{¶71}** As with the first assignment of error, because Mr. Huber and State Farm are seeking to assert a statutory exception, Mr. Huber and State Farm bear the burden of establishing, from the record, that Officer Taylor's conduct was done with malicious purpose, in bad faith, or in a wanton or reckless manner.

Question of Law Presented

**{¶72}** As stated above, a party seeking to exercise a statutory exception bears the burden of demonstrating that exception. *See State ex rel. Nat. Broadcasting Co., Inc. v. City of Cleveland*, *supra*. Thus, for this assignment of error, our analysis will focus upon whether the nonmoving

parties, Mr. Huber and State Farm, have met their burden of pointing to evidence in the record that creates a genuine issue of material fact concerning whether Officer Taylor operated his vehicle with malicious purpose, in bad faith, or in a reckless manner in order to rebut the presumption of immunity to which Officer Taylor and Boston Heights are entitled pursuant to statute. Regarding this burden that Mr. Huber and State Farm have to meet, the Ohio Supreme Court has stated "the burden necessary to deny immunity to police officers is onerous." *Agrabrite* at ¶ 31

<u>Malicious Purpose, Bad Faith, and Recklessness Defined</u>

**{¶73}** "The term 'bad faith' embraces more than bad judgment or negligence; it is conduct that involves a dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive or ill will partaking of the nature of fraud." *Thomas v. Bauschlinger*, 9th Dist. Summit No. 26485, 2013-Ohio-1164, ¶ 22. Reckless conduct is characterized by the conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct." *Anderson* at paragraph four of the syllabus. To be reckless, the actor must be conscious that his conduct will in all probability result in injury, i.e., there must be a perverse disregard of a known risk. *Chunyo v. Gauntner*, 9th Dist. Summit No. 28346, 2017-Ohio-5555, ¶ 9; *O'Toole v. Denihan*, 118 Ohio St.3d 374, 2008-Ohio-2574, paragraph three of the syllabus. "[A]n officer's mere negligence in the performance of official duties does not give rise to personal liability." *Hoffman*, 2017-Ohio-9192, at ¶ 37, citing *Fabrey v. McDonald Village Police Dept.*, 70 Ohio St.3d 351, 357 (1994).

<u>Analysis of Relevant Factors</u>

**{¶74}** Here, Mr. Huber and State Farm do not argue that Officer Taylor acted with malicious purpose or in bad faith. As to whether or not Officer Taylor's conduct was reckless,

Mr. Huber and State Farm fail to point to specific facts in the record that establish Officer Taylor acted with the requisite consciousness that injury would result from his actions. Mr. Huber and State Farm point to the same three things to argue recklessness that were discussed in the first assignment of error: (1) that Officer Taylor failed to use his siren; (2) that Officer Taylor accelerated through the intersection; and (3) that Officer Taylor violated a departmental policy.

*Officer Taylor's Siren*

{¶75} As stated in our resolution of the first assignment of error, the evidence in the record does not create an inference that Officer Taylor failed to activate his siren, and, in fact, there is uncontroverted evidence in the record that Officer Taylor did activate his siren when he entered the intersection. Even Mr. Huber, in his deposition testimony, acknowledged that he heard Officer Taylor's siren shortly before impact.

*Officer Taylor's Speed*

**{¶76}**   The evidence in the record also demonstrates that Officer Taylor was braking and significantly slowed his speed prior to entering the intersection before he began accelerating again at one second prior to impact with Mr. Huber's pickup truck.  Officer Taylor's speed did not reach a speed above the posted speed limit as he proceeded through the intersection.  Both the speed data obtained from Officer Taylor's cruiser, and the eyewitness statements, indicate that Officer Taylor slowed prior to entering the intersection.  As such, we cannot say that Officer Taylor's speed as he proceeded through the intersection demonstrates the requisite "perverse disregard of a known risk" required to establish recklessness, and, therefore, does not establish personal liability on the part of Officer Taylor.

*Violation of Department Policy*

**{¶77}**   As stated above, Boston Heights Police Department Policy 307.5 states that during an emergency call, an officer may "proceed past a red or stop signal [] only after slowing down as may be necessary for safe operation[.]"  While Boston Heights concluded, after an investigation, that Officer Taylor violated this policy, the Ohio Supreme Court has concluded that "[e]vidence of a policy violation demonstrates negligence, at best, unless  there is evidence the actor has knowledge that his conduct will in all probability result in injury."  *See Anderson* at ¶ 31.  As we stated in the first assignment of error, Mr. Huber and State Farm do not point to any evidence in the record that established Officer Taylor had the requisite knowledge that his conduct would in all probability result in injury.  In fact, Officer Taylor offered testimony to the contrary, stating that he proceeded through the intersection thinking everyone had seen him, that he did not see Mr. Huber's pickup truck approaching the intersection, and that if he had seen Mr. Huber, he would have come to a complete stop.  No rebuttal evidence was offered by Mr. Huber or State Farm to

contradict his testimony. Consistent with *Anderson, supra*, on the facts of this case, Mr. Huber and State Farm have at best demonstrated negligence on the part of Officer Taylor but have not established that Officer Taylor operated his vehicle in a reckless manner.

<u>Officer Taylor's operation of his vehicle was not done with malicious purpose,<br>in bad faith, or reckless.</u>

{¶78} While the trial court failed to address in its decision whether Officer Taylor's conduct was reckless, the parties argued the issue to both the trial court and on appeal. Accordingly, after conducting a de novo review of the evidence and making all reasonable inferences in a light most favorable to Mr. Huber and State Farm, we conclude that no genuine issue of material fact remains to be litigated, and Officer Taylor is entitled to summary judgment as a matter of law. Mr. Huber and State Farm failed to meet their burden of pointing to specific facts in the record that establish Officer Taylor operated his vehicle with malicious purpose, in bad faith, or in a wanton manner. Because reasonable minds could not conclude that Officer Taylor acted in a reckless manner, Officer Taylor is entitled to the statutory immunity conferred upon him by R.C. 2744.03(A)(6). As such, the trial court erred in denying Officer Taylor and Boston Heights' motion for summary judgment and their second assignment of error is sustained.

III.

{¶79} Officer Taylor and Boston Heights' first and second assignments of error are sustained. The judgment of the Summit County Court of Common Pleas is reversed, and the cause is remanded for proceedings consistent with this opinion.

Judgment reversed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellees.

---

BETTY SUTTON
FOR THE COURT

TEODOSIO, P. J.
CALLAHAN, J.
CONCUR.

APPEARANCES:

KENNETH A. CALDERONE and FRANK G. MAZGAJ, Attorneys at Law, for Appellants.

JOHN T. SCANLON, Attorney at Law, for Appellee.

WALTER H. KROHNGOLD, Attorney at Law, for Appellee.